IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 16, 2005 Session

## IN RE ADOPTION OF A.M.H., A MINOR

## JERRY L. BAKER AND LOUISE BAKER
v.
## SHAO-QUIANG (JACK) HE AND WIFE, QIN (CASEY) LUO

An Appeal from the Chancery Court for Shelby County
No. Ch-01-1302-3    Robert L. Childers, Chancellor (by Designation)

No. W2004-01225-COA-R3-PT - Filed November 23, 2005

PARTIAL DISSENT

Holly M. Kirby, J., concurring in part and dissenting in part.

## I. INTRODUCTION

While I concur in the majority opinion on some issues, I must dissent from the affirmance of the termination of the Hes' parental rights on the ground of willful failure to visit.[1]   I would instead reverse the trial court's termination of the Hes' parental rights.

For all of its lengthy analysis, the majority fails to address key issues relating to the overriding question of whether the Hes "willfully" failed to visit A.M.H. during the four months preceding the Bakers' petition to terminate the Hes' parental rights. In my view, the Hes' failure to visit A.M.H. during the four months preceding the petition for termination cannot be characterized as "willful" under the statute because: (a) the Hes engaged in regular, once-a-week visitation with A.M.H. prior to the January 28, 2001 incident when visitation ceased; (b) during the four months preceding the filing of the termination petition, the Hes pursued legal recourse in Juvenile Court in

---

[1]I concur in the following conclusions reached by the majority: (1) the settled purpose doctrine is no longer applicable; (2) the termination of the Hes' parental rights on the ground of willful failure to support should be reversed; and (3) the termination of Father's parental rights on the basis that he was not the "legal parent" of A.M.H. should be reversed.  On the ground of persistent conditions, I concur in the result based on the reasoning in *In re Audrey S.*, 2005 WL 2051286, at *21–*24 (Tenn. Ct. App. Aug. 25, 2005), *perm. app. dismissed* (Tenn. Nov. 4, 2005).

an effort to regain custody of A.M.H.; (c) the evidence in the record does not support the trial court's conclusion that the Hes' efforts to regain custody were motivated solely by the Hes' desire to avoid deportation; and (d) the Hes did not know that failing to visit A.M.H. for four months could result in the termination of their parental rights. I believe that, throughout its analysis on the issue of willfulness, the majority applies a different standard than would have been applied had the termination of parental rights been sought by the Tennessee Department of Children's Services ("DCS"). This is wrong. Thus, for these reasons, I would hold that the alleged ground for termination of the Hes' parental rights, their "willful" failure to visit A.M.H., has not been proven by clear and convincing evidence. In addition, I believe that the issuance of the February 2002 no-contact order, prohibiting all contact between the Hes and A.M.H., constituted clear error and unfairly impacted the evidence. All of these issues are discussed below.

## II. "WILLFUL" FAILURE TO VISIT

The Bakers sought to terminate the Hes' parental rights on the ground that they had "abandoned" A.M.H. The term "abandonment" is defined in the termination statutes, and we are bound by that definition:

> (1)(A) "Abandonment" means . . . that:
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have ***willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support*** of the child . . . .

T.C.A. § 36-1-102(1)(A)(i) (Supp. 2004) (emphasis added). Thus, unless the biological parent's failure to visit or support is "willful," abandonment cannot be proven. The failure to support or visit a child is "willful" only if the parent is aware of his or her duty, is able to support or visit and makes no attempt to do so, and has no justifiable excuse for failing to support or visit. ***In re S.M.***, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004).

As outlined below, the Hes had a justifiable excuse for not visiting during the pivotal four-month period, and they had no knowledge that they had a duty to visit or risk losing their parental rights. Therefore, their failure to visit should not have been found to be willful, and their parental rights should not have been terminated.

### (a) "Token" visitation prior to the four-month period

The majority fails to review the trial court's finding that the Hes' visitation with A.M.H. prior to the statutory four-month period amounted to "token" visitation. Analyzing the Hes' conduct during this time, however, is important to put into proper context their actions *during* the pivotal

four-month period.

The phrase "willfully failed to visit," to which Section 36-1-102(1)(A)(i) refers, is defined as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than *token visitation*." T.C.A. § 36-1-102(1)(E) (Supp. 2004) (emphasis added). Under the statute, "'token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." T.C.A. § 36-1-102(1)(C) (Supp. 2004). Thus, visitation is token if it is *either* perfunctory, *or* of an infrequent nature, or both. *See In re M.T.*, No. W2002-03050-COA-R3-CV, 2003 WL 22351012, at \*4 (Tenn. Ct. App. Oct. 14, 2003). Courts have found visitation to be "perfunctory" if the visiting parent has merely a physical presence at the visits and is inattentive or indifferent toward the child. *See DCS v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at \*4 (Tenn. Ct. App. Dec. 30, 2003); *In re Shipley (DCS v. Shipley)*, No. 03A01-9611-JV-00369, 1997 WL 596281, at \*4 (Tenn. Ct. App. Sept. 29, 1997). Whether visitation is "of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child" must be decided on a case-by-case basis. *See, e.g., In re M.T.*, 2003 WL 22351012, at \*4–\*5; *In re Kratochvil (Coone v. Kratochvil)*, No. 03A01-9712-CH-00536, 1998 WL 681334, at \*4 (Tenn. Ct. App. Oct. 2, 1998).

The trial court below concluded that the Hes' visitation with A.M.H. prior to the January 28, 2001 incident amounted to only "token" visitation. Noting that there were about eighty visits in a twenty-month period, roughly once each week and lasting an average of an hour per visit, the trial court calculated that the Hes had spent approximately eighty hours visiting with A.M.H. It observed that this "amounts to a total of less than four (4) days of A.M.H.'s life." The trial court also found that the Hes sometimes missed visits, rescheduled visits, and scheduled visits at times that were inconvenient to the Bakers. It determined that Father "interacted very little with AMH during the visits," and that he talked with Mr. Baker most of the time. The trial court made no findings regarding Mother's interaction with A.M.H. during visits. It concluded from these facts that "[f]rom June 4, 1999, through June 20, 2001, the Hes' visits with AMH were so sporadic, and of such short duration, that it evinced a desire to forego their parental responsibilities to AMH, and it was in conformity with the Hes' agreement that the Bakers would raise AMH until age eighteen." In addition, the trial court determined that the "frequency and duration of the Hes' visits with AMH evinced their intention to have only enough contact with AMH to serve the Hes' stated objective to avoid deportation." The trial court also found that "[t]he Bakers did not obstruct, inhibit, discourage, or otherwise interfere with any reasonable desire on the part of the Hes to visit with A.M.H."

The trial court's finding that the Hes' visitation with A.M.H. was "insignificant, token visitation" is the first juncture at which the trial court's analysis went awry. The trial court's holding on this issue finds no support in cases addressing the issue, which typically involve a scenario in which DCS is the petitioner seeking termination of the natural parents' rights.

Remarkably, the trial court's finding that the Hes' visitation with A.M.H. was "token" is not reviewed by the majority. The majority first acknowledges this Court's prior decisions holding that

-3-

it may be necessary to look at facts occurring outside the statutory four-month period in order to determine the willfulness of a biological parent's failure to visit during the four-month period. Despite having acknowledged this, the majority does not, in fact, consider the Hes' visits. Instead, the majority dismisses the trial court's findings on the Hes' nearly two years of regular visitation with A.M.H., saying only that "they do not warrant mention." The majority later goes even further, asserting that facts which occur before the statutory four-month period "can have *no bearing* on our determination of whether the Hes' conduct within the four-month period was willful." (emphasis in original). Not only is this inconsistent with the majority's prior statement and previous decisions by this Court, it is plainly wrong. Common sense tells us that, in evaluating the parents' conduct during the four-month period, their conduct before that four-month period, both good and ill, is relevant as background. In this case, then, the history of the Hes' visits with A.M.H. must be examined in order to evaluate fully whether their failure to visit after the January 28, 2001 incident was willful.

In a typical case in which DCS has taken the child into protective custody, DCS establishes a visitation schedule for the parent, and that schedule is incorporated into a written parenting plan. The parent is informed that he or she is expected to visit the child in accordance with the schedule, and if the parent does not substantially comply with the plan, DCS may bring an action to terminate the parent's rights.

In this case, of course, DCS was not involved. Rather, the parties agreed to the roughly once-a-week visitation, in accordance with the typical practice of Mid-South Christian Services.[2] In contrast to a case in which DCS sets a visitation schedule, all of the Hes' visits with A.M.H. resulted from the Hes' initiative by contacting the Bakers, setting up the visits, and getting to the Bakers' home.[3] Despite various obstacles, such as lack of money, lack of transportation, the parties' conflicting work schedules, and the birth of the Hes' second child in November 2000, the Hes visited A.M.H. regularly. Moreover, Mrs. Baker's journal shows clearly that, during the visits, Mother consistently made earnest attempts to connect with A.M.H.

Though the Bakers accommodated the Hes' visits, it is undisputed that the Bakers would not permit the Hes to have overnight visits with A.M.H. and never permitted the Hes to take A.M.H. away from the Bakers' home. Relatively early in the parties' relationship, when A.M.H. was eight months old, Mrs. Baker's journal reflects her desire to reduce the frequency of the Hes' visitation: "We would like to get visits to every other week. We felt like they would wean away, but the last 2 visits we could see Casey [Mother] is wanting to come more." In fact, most of the major disputes between the Hes and the Bakers arose from the Hes' efforts to get more time with A.M.H. When the Hes filed their May 2000 petition in Juvenile Court to regain custody of A.M.H., the Bakers were

---

[2]When Mid-South set up the initial foster-care arrangement, the once-a-week visitation was implemented. This was a typical schedule of visitation for interim foster-care arrangements set up by Mid-South. When Mid-South bowed out, the parties continued the same schedule.

[3]When DCS is involved, visits typically do not take place in the foster parent's home, thus diminishing the likelihood of emotionally charged confrontations between the biological parent and the foster parent.

"floored" by it. This led to the tense meeting between Father and Mr. Baker at which they wrote down three options for changing the arrangements in place at that time. All of those options involved the Hes either taking custody of A.M.H. or increasing their visitation. These events prompted the Bakers to hire attorney Weaver to respond to the Hes' first petition for custody and to advise the Bakers on terminating the Hes' parental rights, even before there had been any break in regular visitation.

Neither the Bakers nor the trial court cited any caselaw supporting the trial court's finding of "token visitation" in a case in which the noncustodial parents visited the child eighty times, approximately once per week, over the course of some twenty months. Indeed, one-hour-per-week visitation is at times the *target* amount of visitation established by DCS in a permanency plan. *See, e.g., In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *2 (Tenn. Ct. App. Apr. 14, 2005) (noting that the mother "was allowed one hour per week of supervised visitation" under the parenting plan); *DCS v. C.M.S.*, M2001-02893-COA-R3-JV, 2002 WL 31126645, at *2 (Tenn. Ct. App. Sept. 26, 2002) (noting that visitation was initially set at one hour per week).

In fact, the level of visitation determined to be "token" has virtually always been far less than the eighty once-per-week visits in this case. *See, e.g., DCS v. Lilly*, No. W2003-02156-COA-R3-PT, 2004 WL 948397, at *3 (Tenn. Ct. App. Apr. 30, 2004) (finding token visitation when the mother visited three times during the year prior to termination petition); *DCS v. Atkinson*, No. W2003-02109-COA-R3-PT, 2004 WL 948405, at *4 (Tenn. Ct. App. Apr. 30, 2004) (finding token visitation when the mother visited three times during the four months prior to termination petition, but had lost all contact with DCS during the five months prior to that time period); *In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *7 (Tenn. Ct. App. May 26, 1999) (finding token visitation when the mother visited twice in the nine-month period prior to termination petition); *DCS v. Darr*, No. 03A01-9706-JV-00213, 1998 WL 128874, at *4 (Tenn. Ct. App. Mar. 24, 1998) (finding token visitation when the mother visited once in the ten-month period prior to termination petition); *see also In re M.T.*, No. W2002-03050-COA-R3-CV, 2003 WL 22351012, at (Tenn. Ct. App. Oct. 14, 2003) (finding token visitation when the mother visited eight times out of forty scheduled visits, and the mother had no interaction with the child during the visits); *DCS v. D.D.B.*, No. M2002-00523-COA-R3-JV, 2003 WL 1610875, at *4 (Tenn. Ct. App. Mar. 28, 2003) (finding token visitation when the mother visited eight times over a period of twenty-eight months); *Coone v. Kratochvil (In re Kratochvil)*, No. 03A01-9712-CH-00536, 1998 WL 681334, at *4 (Tenn. Ct. App. Oct. 2, 1998) (finding token visitation when the father had eleven short visits during the nine months prior to termination petition, and did not want to feed the child or change the child's diaper at the visits).

In addition to frequency, courts will consider whether the nature of the visit is perfunctory, or whether the parent was indifferent toward the child during the visits, in determining whether the visit was token. *See L.L.T.*, 2003 WL 23094559, at *4 (finding token visitation when the mother attended all but two visits, but "spent her visitation sessions applying makeup, sleeping, and arguing with Father rather than properly focusing her attention on and caring for the child"); *Shipley*, 1997 WL 596281, at *4 (finding token visitation when the father visited four times during the four months

prior to his imprisonment, but slept during the visits).

In this case, the visitation by the Hes was set in accordance with Mid-South's regular practice during the interim foster-care period and was continued by the agreement of the parties. Despite the Hes' periodic attempts to expand visitation, it remained within the boundaries the Bakers had established. Until the visitation ended on January 28, 2001, the frequency and regularity of the visits were well in excess of that which has been found to be token in DCS cases. At least as to Mother, the evidence does not support a finding that she was indifferent or inattentive to A.M.H. during the visits. Whether the Hes' visitation was "token" should be judged by the same standard as cases in which the visitation schedule is set by DCS. Under this standard, it seems clear that the trial court erred in determining that the Hes' visits with A.M.H. prior to January 28, 2001 were "token."

Of course, all of the Hes' visits with A.M.H. took place prior to the commencement of the statutory four-month period. Nevertheless, it is against this backdrop that the majority should evaluate the willfulness of the Hes' failure to visit during the pivotal four-month period.

### (b) The Hes' conduct during the four months preceding the filing of the termination petition

It is undisputed that the Hes did not visit A.M.H. after the altercation at the Bakers' home on January 28, 2001, just over four months prior to the filing of the petition for termination on June 20, 2001. Evidence of the Hes' actions during the four-month period must be examined to determine if that evidence shows clearly and convincingly that their failure to visit constitutes willful abandonment. As noted above, the Hes' failure to visit during the critical time was not a continuation of past conduct or of general indifference to A.M.H. Rather, it was an abrupt change from the prior regular visitation. Thus, the background for the Hes' sudden decision to cease visitation becomes important in assessing the willfulness of their failure to continue to visit.

The trial court found that the Hes' failure to visit was not based on the Hes' fear that they would be arrested or physically harmed, as the Hes asserted. The majority rightly concludes that this finding is supported by the evidence. Nevertheless, even before the January 28, 2001 incident, evidence from Mrs. Baker's journal shows that the relationship between the Bakers and Hes clearly had soured. The Bakers would later say that, while they were not willing to continue visits in their home after the January 28, 2001 incident, they would have been willing to continue the visits at a neutral location. If so, this was never communicated to the Hes. The Bakers had always required that the Hes' visits take place in their presence, in their home. Realizing that visitation in the Bakers' home was no longer feasible, it was reasonable for the Hes to surmise that they would need court intervention, as they had been told by attorney Weaver when the parties agreed to the custody arrangement.

As the majority opinion recognizes, on February 15, 2001, the Hes faxed a letter dated February 1, 2001 to the Juvenile Court and the media expressing a desire to regain custody of A.M.H. The letter briefly recounted, from the Hes' perspective, the difficulties during August 2000

and January 2001, when the Hes were forced to leave the Bakers' home:

> On August 2, 2000, my wife visited our baby upon the appointment and she was trying to stay 10 more minutes (normally a visit lasts one hour). Bakers immediately asked the police to drive my wife away from their home. On Jan. 28, 2001 (our baby's two-year birthday), we made the appointment to take our baby together to a studio for picture taking, a few minutes after we came to the Baker's family, they refused our request. We begged them to let us go to the studio, and Casey was crying and told them that 2-year birthday was a very special day for the baby and for our family. The Bakers still refused and claimed that they would call the police. Soon the police came and kicked us out of their home.
>
> My wife determined that she would rather die than being separated from her child. In the past two years she has been suffering a great deal emotionally. We have decided to take our child back and go back to China.

The letter then asks the assistance of the court to "[p]lease help us to have our baby return to her own parents."

Juvenile Court employee Sarah Cloud testified that, during the four-month period, the Hes repeatedly contacted Juvenile Court with requests for assistance in regaining custody of A.M.H. She also said that the Hes were unrepresented by counsel. The Hes had brought to Juvenile Court a photo album with several small pictures of A.M.H. and one larger picture. The Hes told Cloud that they thought their arrangement with the Bakers was only temporary custody with open visitation.

On April 9, 2001, a Juvenile Court probation officer, Candace Brown ("Brown"), prepared for the Hes a petition to modify the consent custody order to restore custody of A.M.H. to the Hes. Both Mother and Father were present in Brown's office that day, and Father told Brown that they wanted custody of A.M.H. Nevertheless, after Brown prepared the petition, she had only Mother sign it.[4] Brown would later describe Mother's demeanor during the meeting as "[p]retty much hysterical . . . crying, and she couldn't stop crying. . . . She wanted her daughter back." On May 29, 2001, the petition for custody was filed in Juvenile Court. In the petition Brown prepared, Mother sought custody of A.M.H., but did not request visitation.

On June 6, 2001, the Hes and Mr. Baker appeared for a hearing in Juvenile Court on the Hes' petition for custody. At the outset, Mr. Baker requested that the matter be continued, saying that his lawyer could not be present. Mr. Baker did not inform the Juvenile Court or the Hes that the Bakers' attorney would be preparing and filing a petition to terminate the Hes' parental rights. In accordance with Mr. Baker's request, the Juvenile Court continued the matter until June 22, 2001. However, on June 20, 2001, two days before the scheduled hearing in Juvenile Court, the Bakers filed their

---

[4]Brown listed both Mother and Father as petitioners, but she had only Mother sign the petition. Brown had no explanation for this apparent inconsistency, except that she was "fairly new" in her position with Juvenile Court at the time the petition was signed.

petition for termination in the Chancery Court below, which forced the transfer of the Hes' petition for custody to Chancery Court.[5]

The Hes' actions during the four months preceding the petition, which are not disputed, belie any claim that the Hes' failure to visit A.M.H. during the pertinent four-month period was willful. The Hes' actions certainly did not demonstrate indifference to A.M.H. nor any intent to passively surrender their parental rights. Rather than continue to visit A.M.H., the Hes chose to pursue legal recourse from the Juvenile Court to regain full custody of A.M.H. back from the Bakers. Though a hearing on the Hes' petition had been scheduled in Juvenile Court, the matter was continued at the request of the Bakers. Two days before the postponed hearing was to take place, the Bakers filed their petition for termination in the Chancery Court below, effectively preempting the Hes' efforts to obtain custody. Seeking legal recourse to obtain full custody of the child under these circumstances is a "justifiable excuse" for not visiting during the four months preceding the filing of the petition and, therefore, the Hes' failure to visit cannot be found to have been willful.

In a somewhat analogous case from this Court, a biological parent's pursuit of legal recourse during the statutory four-month period was deemed a "justifiable excuse" for not visiting the child during that time. *In re S.M.*, 149 S.W.3d 632 (Tenn. Ct. App. 2004). In *In re S.M.*, the biological father was from Mexico and had only limited command of the English language. *Id.* at 636. He and the child's mother were never married, and after the child was born, the mother placed the child for adoption with a private agency. The mother did not tell this to the father; she told him that the child had died. *Id.* at 637. Months later, the private adoption agency contacted the father and, with the aid of an interpreter, told him that his daughter was, in fact, alive and in the agency's custody. The agency rebuffed the father's inquiry about visits and advised him to see a lawyer. Soon thereafter, the father retained a lawyer and filed a petition to establish paternity. *Id.* at 638. The agency subsequently filed a petition to terminate the father's parental rights.[6] Later, the father filed a petition to establish visitation and support, but the agency objected. The trial court ultimately denied the motion to set visitation and support pending a hearing on the agency's petition for termination. The agency later acknowledged that it did not promote the relationship between the father and the child during this time, because doing so would have undermined the planned adoption. *Id.* at 643.

After a hearing, the trial court found that the father had abandoned the child by willfully

---

[5]Father testified that he and Mother appeared for the hearing on the petition for custody in Juvenile Court on June 22, 2001. They were surprised when they were informed that the case had been transferred to Chancery Court because of the petition for termination and adoption filed by the Bakers.

[6]Actually, the agency had filed a petition for termination prior to the father's filing of a petition to establish paternity. However, the agency also filed two additional petitions for termination *after* the father filed his petition. The analysis is somewhat complicated by the fact that three termination petitions were filed, making it difficult to identify the four-month period to be considered. *In re S.M.*, 149 S.W.3d at 643. The appellate court found that the father obviously was justified in failing to support or visit the child prior to the first petition, because during that four-month period, he reasonably believed that the child was dead. *Id.* The discussion herein relates to the appellate court's analysis of the father's conduct during the four-month period preceding the other two petitions for termination, which were filed *after* the father learned that his daughter was alive.

failing to support or visit her during the four months prior to the petition for termination. ***Id.*** at 640. The appellate court reversed, finding that father's failure to support or visit the child during the pertinent period was not "willful" under the circumstances. ***Id.*** This Court described the standard for "willful" failure to support:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. . . . Failure to support a child is "willful" when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support and has no *justifiable excuse* for not providing the support.

***Id.*** at 641–42 (emphasis added). The same standard was applied to the father's alleged willful failure to visit. This Court found that the father had a "justifiable excuse" for failing to support or visit the children because (1) the agency was not promoting the relationship between the father and the child in light of the planned adoption, and (2) the father had "diligently pursued establishing a relationship with [the child] through the courts." ***Id.*** at 643. Thus, the appellate court reversed the termination of the father's parental rights, concluding that his failure to visit or support the child was not "willful" under the circumstances. ***Id.*** at 643–44.

In this case, the Bakers admit that, during the four-month period prior to the filing of the petition for termination, they did nothing to encourage the relationship between the Hes and A.M.H. in light of their planned adoption of A.M.H. Although the Hes were not in danger of physical harm, it was clear that the status quo had been affected, such that the Hes were no longer welcome to visit at the Bakers' home after the January 28, 2001 incident. Within days after the incident, the Hes took actions in Juvenile Court to pursue custody. As in ***In re S.M.***, the Hes' pursuit of a legal remedy in Juvenile Court was a "justifiable excuse" for not visiting during that time. Consequently, as in ***In re S.M.***, the Bakers have not presented clear and convincing evidence that the Hes' failure to visit A.M.H. was "willful."

Surprisingly, the trial court determined that the failure of the Hes to seek *visitation* in their petition for custody "evinces [Mother's] willful abandonment of A.M.H." This determination defies logic; the petition did, after all, seek *full custody* of A.M.H., much more than mere visitation.[7] The trial court's finding in this regard is not questioned, nor even discussed, in the majority opinion. This determination should have been rejected by the majority, because it has no basis in law.

The trial court also based its determination of "willfulness" on its finding that the filing of the Hes' juvenile court petition for custody was motivated by their desire to avoid deportation. As explained below, this finding is not supported in the record, and the majority fails to recognize the lack of evidentiary underpinning for the trial court's holding.

___

[7]In its finding, the trial court observed, "It is well-settled that a parent may always petition to have visitation reinstated upon a showing of changed circumstances." The trial court does not explain how the Hes, who were unrepresented, would have known this.

### (c) Fear of deportation as the Hes' sole motivation for seeking custody

The trial court found that the Hes' pre-January 28, 2001 visits with A.M.H. took place only "to serve the Hes' stated objective to avoid deportation." The trial court also determined that the Hes' May 2000 petition for full custody of A.M.H. was filed "for the sole purpose of avoiding deportation" based on "the close proximity of the call from the INS and the filing of the petition." Most importantly, the trial court determined that the Hes' second petition for custody, filed within the pivotal four-month period, was also filed "for the sole purpose of remaining in the United States and avoid deportation." The trial court stated that this was "[a]gain, due to the close proximity of the call from the INS and the filing of the petition . . . ." This finding is the *cornerstone* of the trial court's conclusion that the Hes' failure to visit during the four-month period was "willful," because it is the basis on which the trial court concludes that the Hes' juvenile court petition and their other efforts to obtain custody were mere window dressing and did not constitute a "justifiable excuse" for not visiting. *See In re S.M.*, 149 S.W.3d at 643. Rather than setting out in detail the evidence supporting the trial court's conclusion, the majority simply states broadly that "the Hes' desire to avoid deportation has been a consistent theme throughout the tortured history of this case" and defers to the trial court's assessment of the witnesses' credibility.

The majority's treatment of the evidentiary basis for such a crucial finding is, in my view, wholly inadequate. Without a doubt, in its detailed, careful opinion, the trial court stated in the strongest terms its findings on credibility, that Father was deceitful and dishonest, and that Mother was dishonest, manipulative, and theatrical. In contrast, the trial court found the Bakers to be sincere, honest, and credible witnesses. All of these findings are well-supported by the evidence, and the majority rightly accords great deference to the trial court's assessment of the parties' demeanor and credibility. Nevertheless, even deferring to the trial court's credibility determinations, there must be evidence in the record to support the trial court's sweeping conclusion that all of the Hes' visits with A.M.H. and their efforts to regain custody of her, particularly during the pivotal four-month period, were done for the *sole* purpose of avoiding deportation.

The Bakers' attorney sought to establish, through repeated and exhaustive questioning, that the Hes' fear of deportation motivated their conduct, and that their claimed desire to parent A.M.H. was insincere. However, questions from lawyers do not constitute evidence. There are no documents in the record or testimony from an immigration official or anyone else showing when Father was contacted by the INS, or what topics were discussed by Father and any INS official. Rather, the record contains only Father's testimony regarding his communications with immigration officials and the Hes' fear of deportation. Therefore, we must examine that testimony.

In his testimony, Father admitted that he had been in the United States illegally since he lost his position with the University of Memphis. He admitted that he and Mother feared deportation after he lost his legal status. Father further admitted that he had told immigration officials that he could not leave the United States because he had felony charges (of sexual assault) pending against him, and because there was a pending civil case relating to his daughter. Father was under the impression that, if the criminal charges were dismissed and the litigation concerning A.M.H. were

over, he would be deported. As to Mother, Father said that her right to be in the United States was based on her status as legal guardian of their daughter, a United States citizen. At the conclusion of the three-month foster care period, Father told the Bakers that he and Mother wanted to retain their parental rights because of their perception that it would help them remain in the United States.

Father testified in response to repetitive questioning about whether he was contacted by INS officials and when the contacts were made. With respect to the Hes' May 2000 petition for custody, Father was asked whether, "a month or so before that time when you filed that petition," he was "called to INS . . . to discuss your status . . . ." Father acknowledged that he had been "called by deportation a few times." Then the following colloquy occurred:

> [Bakers' Counsel]: But the first time was in the spring of 2000 about a month before you filed the first Petition to Modify, is it not?
> [Father]: Uh-huh.
> [Bakers' Counsel]: And before that, you did —
> [The Court]: I'm sorry. Mr. Parrish, excuse me. What was his answer?
> [Attorney ad litem interrupts and interjects]: Yes.
> [Father]: My answer is yes, I have been called.

Even assuming that this unclear testimony established the time frame of the INS's call to Father, there is no evidence on the substance of the conversation between Father and the INS official, any issues raised by the official, or how the filing of the petition for custody would have addressed any INS concerns.

As to the Hes' second petition for custody, filed within the pivotal four-month period before the Bakers' petition for termination, Father was questioned by the attorney ad litem, who advocated on behalf of the Bakers' position, consistently pursuing similar lines of questioning as the Bakers' counsel:

> [Attorney Ad Litem]: And then you filed the petition, the first one, since you gave custody away, to get custody back; correct? Yes or no?
> [Father]: Yes, I filed petition.
> [Attorney Ad Litem]: When did you file the second petition?
> [Father]: April – April 9, 2001.
> [Attorney Ad Litem]: Didn't you hear from I.N.S. in March of 2001?
> [Father]: I was not sure about the date.
> [Attorney Ad Litem]: What do you think?
> [Father]: I think it was between March or April or May – between March and May, let's say.
> [Attorney Ad Litem]: It was before April the 9[th] of 2001, was it not?
> [Father]: I'm not sure ma'am.

Again, Father's testimony about the timing of the call was uncertain at best, and no testimony was

elicited relating to the substance of any conversation between Father and any INS official or any concerns raised by INS.

That is the sum total of the evidence on any alleged nexus between contacts from the INS and the Hes' petition for custody. From this, the trial court made the finding of fact that "[t]he INS contacted Mr. He about the Hes' immigration status in March, April, or May, 2001." The trial court extrapolated from this evidence that, because the INS contact with Father occurred "around the time" the Hes filed their second petition for custody, then the Hes' fear of deportation was the *sole* motivation for the May 2001 petition for custody.

The evidence of the "close proximity" between the calls from the INS and the Hes' petition is clearly insufficient. It must be emphasized that the Hes' February 1, 2001 letter to Juvenile Court was faxed *before* any INS contact with Father in March, April, or May 2001. How can the INS call have motivated the Hes' petition for custody if it came *after* the Hes wrote the Juvenile Court asking for assistance in regaining custody? Notably, in its detailed findings of fact, the trial court makes *no* mention of the Hes' February 2001 letter to Juvenile Court. Unfortunately, in reviewing the trial court's expansive conclusion that all of these actions by the Hes were done for the *sole* reason of avoiding deportation, the majority glosses over the evidence, commenting only that the finding is supported because "the Hes' desire to avoid deportation has been a consistent theme throughout the tortured history of this case," and that "the record is replete with instances where the Hes expressed concerns about deportations as it relates to their daughter." Such amorphous description of the evidence does not substitute for analysis. This Court should explicitly set forth the evidence it believes supports the trial court's finding of a nexus between the contacts from the INS and the Hes' petition for custody, to determine if the finding is adequately supported; the majority has failed to do so on this key issue.

Furthermore, it is undisputed that the criminal charges against Father remained pending until well after the Bakers' petition for termination was filed. Therefore, filing the petition for custody was not necessary for the Hes to be allowed to remain in the United States. Moreover, the Hes' second child, Andy, was born in the United States in November 2000.[8] The birth of their second child, also a United States citizen by birth, made the Hes' retention of parental rights to A.M.H. unnecessary for purposes of remaining in the United States, at least according to the Hes' belief that retaining such parental rights would allow them to stay in the country. These facts undermine any inference that the Hes' filing of a petition for custody of A.M.H. was motivated by their intent to create a legal controversy to serve as a basis on which they could legitimately remain in the United States. There is simply no evidence of how the filing of a petition for custody would have helped the Hes avoid deportation.

It bears repeating that, before the Bakers' petition for termination was filed in Chancery Court, the Hes were *in Juvenile Court seeking full custody* of A.M.H. Despite this fact, the trial court concluded that, as of the date of the Bakers' petition for termination, the Hes had willfully

---

[8]The Hes also have a third child, Avita, who was born in the United States in September 2002.

abandoned A.M.H. by failing to visit her for slightly more than the statutory four-month period. In order to do so, the trial court had to rely on the three most questionable findings in its opinion: (1) that the Hes' agreed-upon once-per-week visitation amounted to token visitation; (2) that the *sole* reason for the Hes' visits and both petitions for custody of A.M.H. was to avoid deportation; and (3) that failing to include a request for visitation, in addition to the request for full custody, in the second petition showed the Hes' intent to abandon A.M.H. The majority simply accepts these findings with little analysis and concludes that this amounts to "clear and convincing" evidence of willful intent to abandon. I cannot agree.

### (d) Lack of knowledge of the consequences of the failure to visit

Regardless of the above considerations, the Hes' parental rights should not be terminated in this case because the Hes did not know that their failure to visit A.M.H. for four consecutive months could result in the termination of their parental rights. If the petition to terminate the Hes' parental rights had been filed by DCS, DCS would have been required to show that the Hes had knowledge that they were obligated to visit A.M.H. or risk losing their parental rights. The same standard should be applied to the Bakers' petition.

In an opinion issued after the trial court's decision below, this Court held that a parent's failure to visit her child was not willful when the parent did not know that her failure to visit the child for four months could result in the termination of her parental rights. In *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618 (Tenn. Ct. App. Apr. 29, 2005), as in the instant situation, DCS was not involved, and the termination petition was filed by the custodians of the mother's child.[9] As background, the biological mother had a long-term addiction to crack cocaine, and the father was in and out of jail for various offenses. The mother feared that her child would be taken from her if she turned to DCS for help, so she accepted assistance from a private ministry established "to keep families together." *In re W.B., IV*, 2005 WL 1021618, at *1–*2. Because the mother had repeatedly subjected the child to unsafe conditions, she agreed to give temporary custody of the child to an associate of the ministry for the stated purpose of allowing the mother to obtain long-term treatment for her addiction.[10] *Id.* at *3.

The mother in *In re W.B., IV* did not complete the rehabilitation program and ended up incarcerated for a short time. Later, after the mother had "borrowed" a car from the ministry associate's husband, the associate filed a dependency and neglect petition against the mother. The mother was brought from the jail in which she was incarcerated to attend the hearing on the petition. The petition was granted, and the Juvenile Court entered an order placing the child in the associate's custody. *Id.* at *2. The mother was released from jail shortly thereafter.

---

[9]Though the mother had other children involving other fathers, the appeal at issue involved only the youngest of her children, W.B., IV. *In re W.B., IV*, 2005 WL 1021618, at *1 n.1.

[10]It was undisputed that the agreement the mother signed relinquishing custody mentioned neither support nor visitation.

-13-

Later, the ministry associate became acquainted with a couple who were interested in helping the associate care for the child, and the child began to live with the couple. Eventually, the couple filed a petition for custody of the child, which stated that they "wish to adopt the [child] and plan to proceed with legal proceedings necessary to accomplish this adoption." *Id.* at \*3. The mother was not told of this transfer of custody. The couple thereafter filed a petition to terminate the mother's parental rights and adopt the children, asserting that the mother had abandoned the children by willfully failing to support or visit them for at least four months preceding the petition.

At the time the ministry associate transferred custody of the children to the prospective adoptive family, the biological mother had not visited the children for at least five months. Once the biological mother learned of the transfer of custody, her efforts at making contact were limited to angry telephone calls to the ministry associate. The mother took no legal measures to locate the children or to establish visitation. *Id*. at \*1–\*4. By the time the prospective adoptive family filed a petition to terminate the mother's parental rights in November 2003, the biological mother had not seen the children for almost ten months. The trial court found that the biological mother had abandoned her children by willfully failing to visit or support them and terminated her parental rights on that ground. *Id.* at \*6. The mother appealed.

The appellate court in *In re W.B., IV* recognized that the children had not been taken into State custody by DCS, rendering inapplicable the statutes requiring DCS to explain to the biological parent the definition of abandonment and the criteria for termination of parental rights. *Id.* at \*11 (citing T.C.A. § 37-2-403(a)(2) (Supp. 2004)). Nevertheless, the court emphasized, "Mother's knowledge of a duty or expectation that she provide support and visit is a factor in determining willfulness." *Id.* The court stated, "Nothing in the record indicates Mother was informed by anyone that her failure to visit or support the children for four consecutive months could result in termination of her parental rights." *Id.* at \*12.[11] On these facts, the appellate court concluded that the evidence did not rise to the level of "clear and convincing" that the mother's failure to visit her children during the four months immediately preceding the filing of the petition was willful.[12]

In its conclusion, the *In re W.B., IV* court stated:

---

[11]The appellate court observed: "It is difficult to understand how Mother could have visited the children while she was unaware of their whereabouts. Of course, she could have taken steps through the courts to find the children and establish visitation." *In re W.B., IV*, 2005 WL 1021618, at \*11.

[12]The principle in *In re W.B., IV* has precedent under prior law. See *Pierce v. Bechtold*, 448 S.W.2d 425 (Tenn. Ct. App. 1969), in which the biological mother, alone and in financial straits, asked a relative to care for one of her children for an extended time. When the relative later sought to terminate the mother's parental rights and adopt the child, the appellate court observed that persons who are willing to shelter a child under these circumstances

> . . . are a boon to unfortunate and abandoned mothers, and their generosity is not expected to hide the trap of abandonment and ultimate loss of parent-child relationship. If there is any such expectation, *the mother is entitled to be put on notice of the peril of accepting such generosity*.

*Pierce*, 448 S.W.2d at 430 (emphasis added).

Much of the testimony at trial and much of the trial court's ruling had to do with the children's best interests, *i.e.*, the second prong of the two-part requirement for termination of parental rights. It would be improper for us to determine whether there was clear and convincing evidence that such interests lay in termination of Mother's . . . parental rights because of our conclusions that no ground for termination was shown by the constitutionally and statutorily-mandated standard.

*Courts are not authorized to terminate a parent's rights only because the children would be better off with such termination.* There must first be a showing that a parent has in essence forfeited his or her rights through conduct the legislature has determined constitutes sufficient danger of harm to the child to be made a ground for termination. . . .

Thus, despite the good intentions of the [prospective adoptive family] to provide a stable and nurturing environment for [this child] by adopting [him], our decision cannot be based on the benefits to the children from such an outcome without proof of grounds.

*Id.* at \*13 (emphasis added; citations omitted); ***see also In re K.C., Jr.***, 2005 WL 2453877, at \*10–\*11 (no abandonment by failure to support where the mother was not informed that failing to pay support put her parental rights at risk).

Although ***In re W.B., IV*** was decided after the trial court below rendered its decision, its reasoning is applicable here. In any case in which the court is asked to terminate parental rights, the definition of willfulness remains the same, regardless of the involvement of DCS. Indeed, the legislature's designation of DCS as having a duty to inform the biological parent that failure to support or visit could result in the termination of parental rights indicates the legislature's intent that willfulness involve the abrogation of a *known* duty.[13] This supports the conclusion in ***In re W.B., IV*** that, even if DCS did not take the child into custody, in order to prove willfulness, the petitioner must show that the biological parent had some understanding of the consequences of his action or failure to act.

The majority acknowledges ***In re W.B., IV*** and notes that "[t]he parties do not dispute that the Hes never received . . . notice" that the failure to visit would result in the termination of their parental rights. However, the majority does not discuss the facts in ***In re W.B., IV***. Rather, it

---

[13]As noted by the majority, where the State takes custody of a child and places the child in foster care, Tennessee statutes require that the biological parents be informed of the definitions of abandonment and the criteria for termination of their parental rights, such as in the permanency plan developed for the parents. *See* T.C.A. §§ 37-2-403(a)(2)(A) & (2)(B)(i) (Supp. 2004). If the child has been taken into State custody, this Court has held that a parent's failure to pay child support may not be deemed willful if DCS did not inform the parent of his duty to provide support, or if the parent was led to believe that the payment of support was not necessary in order to maintain his parental rights. ***In re J.J.C. (State v. Calabretta)***, 148 S.W.3d 919, 927 (Tenn. Ct. App. 2004); ***State v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at \*12–\*13 (Tenn. Ct. App. Aug. 13, 2003).

minimizes the holding in that case by characterizing the parents' lack of knowledge as "merely" a factor, and then gives that factor no weight. It is clear that, if the petitioner in this case were DCS, the lack of such knowledge would be fatal to the petition to terminate parental rights.

In this case, it is undisputed that, while attorney Weaver told the Hes that under the consent order arrangement they might have to file a petition in Juvenile Court to regain custody, he did not address the standards for the termination of the Hes' parental rights and did not inform them that failing to visit A.M.H. could have such a catastrophic result. Father asked Weaver questions about the Hes' opportunity to visit A.M.H., but was not informed that there was in fact an obligation to visit her, lest they lose their parental rights.[14] As in *In re W.B., IV*, nothing in this record indicates that the Hes were informed by anyone at any time that their failure to visit for four consecutive months could result in the termination of their parental rights. The Hes' lack of knowledge of the potential consequences of failing to visit is important in determining whether their failure to visit during the four-month period was willful.

In comparison, the facts in *In re W.B., IV* were considerably more adverse to the biological parent than in the instant case. As we have stated, the mother in *In re W.B., IV* was a long-time crack cocaine addict whose chronic substance abuse led her to endanger the children on numerous occasions, living with the children in unfit conditions, living with various persons, spending support money on drugs, and ultimately leaving the children in a hotel room with an unknown man. The father was also a recovering addict who had felony convictions and several periods of incarceration. By the time the petition to terminate parental rights had been filed, the mother had not seen the children for almost ten months, and her visits prior to that had been sporadic. The mother had taken no legal measures to gain access to her children and had no visible source of income.

Certainly the Hes are not paragons of virtue, and the trial court's finding that they were often dishonest and manipulative is well-supported. However, in contrast to the mother in *In re W.B., IV*, the Hes are well-educated with no evidence of substance abuse, and industrious to the point that Mrs. Baker's journal entry criticizes them for "working all the time." There is no evidence that they had ever endangered A.M.H. or her younger brother and sister in the Hes' custody. Unlike the situation in *In re W.B., IV*, the Hes visited A.M.H. with regularity until very shortly before the crucial four-month period. Furthermore, the Hes initiated legal measures to gain custody of A.M.H. during the four-month period, unlike the mother in *In re W.B., IV*. Therefore, the factors weighing against the Hes are much less than the factors weighing against the mother in *In re W.B., IV*.

The majority in this case dismisses the Hes' lack of knowledge as "merely" a factor to consider in determining whether their failure to visit A.M.H. was willful, even though that same factor was found to be determinative in *In re W.B., IV*. How can this disparity be justified? Fairness dictates that parents and petitioners in all termination cases be held to the same standard, regardless of whether DCS is involved, as this Court recognized in *In re W.B., IV*.

---

[14]The observation of this fact does not imply that Weaver had a duty, statutory or otherwise, to advise the Hes on the law of abandonment or termination of their parental rights.

In order to sidestep the real problem in its analysis, the majority acts as though the complaint in this dissent is with the legislature. It is not. The statutory definition of "abandonment," i.e., willful failure to visit, is *exactly the same* regardless of whether the petitioner is DCS or a private individual. The real problem lies in the majority's failure to apply the same statutory definition to the Hes, as was done in *In re W.B., IV.*

Therefore, for all of these reasons, I disagree with the majority's conclusion that clear and convincing evidence establishes that the Hes' failure to visit A.M.H. during the four months preceding the termination petition was "willful."

### III. THE NO-CONTACT ORDER

I also feel compelled to comment on the trial court's February 8, 2002 no-contact order, which prohibited the Hes from having any contact with A.M.H. during the pendency of the litigation. The majority does not address the Hes' argument that the trial court erred in issuing the no-contact order. Given the majority's conclusion, the omission of any analysis on this issue is understandable. In my view, however, the issuance of the no-contact order had a profound effect on the case, and the error in the trial court's ruling in this regard must be recognized.

The majority opinion does a commendable job of explaining the genesis of the no-contact order and the confusion regarding its basis in fact. As outlined in the majority opinion, the issue arose when the Hes initially refused to comply with the trial court's order to turn over A.M.H.'s passport. At the same time, the Hes' attorney had just withdrawn, apparently due to a conflict in representing both Mother and Father simultaneously, and the Hes were, therefore, without counsel. The Bakers had made no request for such an order, and the record contains no such recommendation from the guardian ad litem. Apparently, the trial judge at that time, Chancellor D. J. Alissandratos, issued the order in response to a verbal, off-the-record suggestion from the guardian ad litem, prompted by the Hes' refusal to turn over the passport. I can only say "apparently" on the rationale for the order, because there were no pleadings or written recommendations, there was no hearing, and there was no opportunity for the Hes to be heard on the issue. The order simply appears in the record.

When the Hes later retained separate counsel and sought a hearing on the issue, the record was such that Chancellor Alissandratos could neither remember nor reconstruct his reason for issuing the order. He could only surmise that he must have had "a reason" for his decision. Thereafter, the Hes' newly retained attorneys made repeated, vigorous attempts to get a hearing to challenge the no-contact order. All of these attempts were rebuffed for a variety of reasons, even long after the Hes had turned over A.M.H.'s passport. Finally, by the time the case was reassigned to Judge Childers, the no-contact order had been in effect almost two years. When the issue was raised to him, he quite understandably felt that the best course of action was simply to get the case tried as quickly as possible and, therefore, declined to reconsider the order. As a result, the Hes have never even had a hearing on the issue, and the order remains in effect to this day.

In many cases involving the termination of parental rights, a no-contact order may be necessary for a plethora of reasons where, for example, the biological parents might harm the child, the biological parents have engaged in substance abuse, or there is evidence that the visits upset the child. *See, e.g., Barker v. Barker*, No. W2003-01989-COA-R3-CV, 2004 WL 1908802, at *2 (Tenn. Ct. App. Aug. 23, 2004) (noting that Father stipulated that no-contact order was proper based on alleged emotional abuse); *Whitman v. Gifford*, No. 02A01-9206-CC-00172, 1993 WL 54603, at *5–*6 (Tenn. Ct. App. Mar. 3, 1993) (concluding that the trial court did not err in withdrawing a no-contact order, which was based on alleged sexual abuse, when such withdrawal was determined to be in the best interest of the child). This is not such a case. In this case, no evidence of potential harm was presented to Chancellor Alissandratos in support of the no-contact order, nor was any such evidence ever presented to the trial court throughout the proceedings below. Assuming that the order originally arose from a concern that the Hes, armed with A.M.H.'s passport, would spirit her out of the country, this could have been addressed through supervised visitation, a point made by the Hes' attorneys in their repeated, fruitless efforts to obtain a hearing on the issue.

During the trial, the Hes presented testimony from two psychologists, both of whom were deeply disturbed that the Hes had been prevented from having visits with A.M.H. One of the experts, psychologist Dr. John Ciocca, testified presciently that, because the issue before the court was "which relationship will survive," it was important to allow the Hes to have contact with A.M.H. during the pendency of the litigation so as not to "make the decision for the Court in a presumptuous way by allowing [the Hes' relationship with A.M.H.] to die an untimely death." This "untimely death" of the Hes' relationship with A.M.H. was, in my view, the inescapable effect of the no-contact order.

In virtually all cases involving the termination of parental rights, the child has been out of the custody of the biological parent for a significant amount of time. In such cases, the question is not simply who will have custody of the child, but whether the child is better off without the biological parent in her life at all. Therefore, the statute mandates that the court consider whether the parent "has maintained regular visitation or other contact with the child" and whether "a meaningful relationship has otherwise been established between the parent . . . and the child." T.C.A. § 36-1-113(i)(3) – (4) (2005). Here, precluding the Hes from any contact with A.M.H. during the two-year pendency of the case, without ever even affording them an opportunity to be heard, insidiously corrupted the status quo such that a finding that the Hes had not maintained a meaningful relationship with A.M.H. was virtually assured. Thus, even if the Hes' parental rights had not been terminated, the ill-considered no-contact order doomed their petition for custody and effectively preordained the outcome of the litigation. This was clear error.

In sum, I would not only hold that grounds for the termination of the Hes' parental rights have not been established by clear and convincing evidence, I would further conclude that the no-contact order was issued in error and that it should be vacated so that the Hes may have an opportunity to reestablish their relationship with A.M.H.

## IV. CONCLUSION

In this case, as in most cases involving the termination of parental rights, the biological parents have numerous liabilities and challenges, and there is powerful evidence that the foster parents will "provide a stable and nurturing environment for [this child] by adopting [her]." **W.B., IV**, 2005 WL 1021618, at *13. Nevertheless, "our decision cannot be based on the benefits to the children from such an outcome without proof of grounds." **Id.** Though it may be tempting in some cases to focus primarily on the evidence pertaining to the best interest of the child, especially when the adoptive parents are the petitioners and are so prominently involved in the litigation, this Court is "not authorized to terminate a parent's rights only because the children would be better off with such termination." **Id.** The termination statutes plainly require there to be clear and convincing evidence of one of the grounds for termination before the best interest of the child can even be considered. No such grounds were proven in this case. I am keenly aware that our decision involves not simply "rights," but the life and well-being of an innocent child. Nevertheless, as a court of law, we are not at liberty to apply the statutes as we wish them to be.

To ensure confidence in the fair and consistent application of the law in our judicial system, the Tennessee Supreme Court should address at least one important issue: whether, when a termination petition is filed by a private litigant rather than DCS, the biological parent's rights may be terminated when the parent did not know that failing to support or visit the child for four months could result in the termination of the parent's parental rights. Furthermore, the Tennessee legislature should consider modifying the statutes governing the termination of parental rights to address cases in which DCS is not involved, particularly with respect to the issue of notice.

For the foregoing reasons, I respectfully dissent.

_____
HOLLY M. KIRBY, JUDGE

-19-