IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 7, 2004

IN RE S.M.

Appeal from the Juvenile Court for Davidson County
No. 2219-67013      Betty Adams Green, Judge

No. M2003-00422-COA-R3-PT - Filed January 15, 2004

This appeal involves the termination of the parental rights of a biological father whose daughter was surrendered to a licensed child-placing agency without his knowledge.  Soon after notifying the biological father that it had custody of the child, the agency filed a petition in the Davidson County Juvenile Court seeking to terminate the father's parental rights.  Following a bench trial, the juvenile court concluded that the biological father had abandoned his daughter and that the child's best interests required terminating her biological father's parental rights.  We have determined that the agency has failed to present clear and convincing evidence that the biological father has abandoned his daughter.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., joined.  WILLIAM B. CAIN, J., filed a concurring opinion.

Joanie L. Abernathy, Franklin, Tennessee, for the appellant.

Lisa L. Collins, Nashville, Tennessee, for the appellee, The Association for Guidance, Aid, Placement and Empathy.

Susie Piper McGowan, Nunnelly, Tennessee, Guardian Ad Litem.

**OPINION**

**I.**

R.G.L. was born in Guadalajara, Mexico and migrated to Middle Tennessee in the late 1990s to join several members of his family who were already residing in Nashville.[1]  He is twenty-three years old and works as a house painter. He also has a wife and a daughter who are now residing in Mexico.  R.G.L. attended school in Mexico until he was fourteen, and he is not fluent in English.

_____

[1]R.G.L.'s mother, father, brother, and several uncles and cousins were already living in Nashville.

Sometime in 2000, R.G.L. became romantically involved with C.M., a teenage Mexican emigré who was living in Nashville with another man. After R.G.L. discovered that C.M. was pregnant, he provided her approximately $1,000 for medical expenses and clothing, and eventually paid for her to travel to Chicago to be with her mother during the later stages of her pregnancy. However, R.G.L.'s relationship with C.M. was strained because she apparently declined to end her relationship with the other man with whom she had been living.

In September 2001, during her eighth month of pregnancy, C.M., without R.G.L.'s knowledge, made an arrangement with The Association for Guidance, Aid, Placement and Empathy ("A.G.A.P.E."),[2] a licensed child-placing agency in Nashville, to surrender her child for adoption. Christy Akers, a social worker employed by A.G.A.P.E., informed C.M. that the child could not be placed for adoption without the biological father's consent. For some reason, C.M. informed Ms. Akers that O.M.O. was the child's biological father and, at Ms. Akers's direction, obtained O.M.O.'s written waiver of his interest in the child. As far as the record shows, A.G.A.P.E. never undertook to independently verify that O.M.O. was the child's biological father.

C.M. gave birth to S.M. on September 28, 2001 in Nashville. The child's birth certificate did not list a father's name, and two days following the birth, A.G.A.P.E. took custody of the child and placed her with her pre-adoptive family.[3] For its efforts, A.G.A.P.E. received a $1,000 fee for inspecting the adoptive parents' home, as well as a $9,500 placement fee. When R.G.L. inquired about the baby, C.M. and her mother told him that the child had died. R.G.L. did not pursue the matter.

On February 12, 2002, C.M. returned to A.G.A.P.E.'s office and told Ms. Akers that O.M.O. was not S.M.'s biological father. She revealed that R.G.L. was actually the child's father and provided Ms. Akers with his telephone number. Ms. Akers later characterized the news as "disconcerting" because she understood immediately that it would cause problems with the adoption. Ms. Akers, who does not speak Spanish, decided to call R.G.L. immediately. When she reached him by telephone on February 13, 2002, she told him that A.G.A.P.E. had custody of his daughter and that she wanted to talk with him as soon as possible. R.G.L. told her that he could not understand her and that she should talk with his brother who was more fluent in English. In a later telephone conversation with R.G.L.'s brother, Ms. Akers arranged for a meeting with R.G.L. on February 20, 2002.

---

[2]The first letters of the organization's name are an acronym spelling "agape." While the word has several meanings, the organization's intended reference is to one of the Greek words for "love" that is now most commonly understood in the New Testament sense as Christian love (of God or Christ or fellow Christians). 1 THE OXFORD ENGLISH DICTIONARY 243 (2d ed. 1989).

[3]Ms. Akers characterized S.M.'s initial placement as "preadoptive" because A.G.A.P.E. had entered into an adoption contract with the parents and because A.G.A.P.E. believed that the biological parents had been identified, that these parents had surrendered their parental rights, and that the rescission period had passed. However, when A.G.A.P.E. learned that R.G.L. was actually the child's biological father, it changed the characterization of the placement from "pre-adoptive" to "legal risk." A legal-risk placement reflects the reality that the biological parents may be permitted to visit the child and that a plan of care resulting in the eventual reunification of the child with one of its biological parents may be adopted.

R.G.L. and Ms. Akers met on February 20, 2002 at A.G.A.P.E.'s office. He was accompanied by John Faccadio, his employer.[4] Ms. Akers readily observed that R.G.L.'s English was "limited," and so Mr. Faccadio translated for both of them as best he could. R.G.L. explained to Ms. Akers that C.M. had told him that S.M. had died and that he had not attempted to verify that information. He also provided details regarding his personal background and relationship with C.M. He told her about his migration from Mexico, his immigration status, and his employment and salary. R.G.L. also told Ms. Akers that his wife had discovered his relationship with C.M. and that she and their daughter had returned to Mexico in January 2002.

Ms. Akers informed R.G.L. that his daughter had not died and that she was, in fact, healthy and in A.G.A.P.E.'s custody.[5] When R.G.L. asked to see his child, Ms. Akers told him that she could do nothing to assist him and that she could not provide him with any additional information. She told him that he needed to take steps if he desired to have a relationship with his daughter and that he should hire a lawyer and file a petition to establish parentage within thirty days. Ms. Akers did not inform R.G.L. of his parental rights or describe how R.G.L. could arrange for visitation or begin paying child support.

On the day after her meeting with R.G.L., Ms. Akers met with A.G.A.P.E.'s lawyer to decide what should be done about S.M. Terminating R.G.L.'s parental rights was one of the options discussed. Soon thereafter, A.G.A.P.E. decided to pursue terminating R.G.L.'s parental rights. After making the decision to file suit, A.G.A.P.E. opposed permitting R.G.L. to establish any sort of parental relationship with S.M. On March 12, 2002, less than thirty days following Ms. Akers's meeting with R.G.L., A.G.A.P.E. filed a petition in the Davidson County Juvenile Court to terminate R.G.L.'s parental rights on the ground of abandonment.

Within days after meeting with Ms. Akers, R.G.L. retained a lawyer to begin the proceedings to establish his parentage of S.M. as Ms. Akers suggested. On April 9, 2002, his lawyer filed a petition to establish parentage. Three days later, he filed an answer to A.G.A.P.E.'s petition denying that R.G.L. had abandoned the child. Following a hearing on April 12, 2002, the juvenile court entered an order on April 30, 2002, (1) appointing a guardian ad litem for S.M., (2) directing the parties to undergo genetic testing to determine S.M.'s parentage, and (3) setting a hearing on A.G.A.P.E.'s petition for September 18, 2002.

The results of the genetic tests were released in early June 2002 and demonstrated conclusively that R.G.L. was S.M.'s biological father. The trial was continued twice and was eventually rescheduled for December 16, 2002. In the meantime, A.G.A.P.E. filed two amended termination petitions because R.G.L. had neither visited nor supported S.M. since his February 2002 meeting with Ms. Akers. In late October or early December, R.G.L. became concerned that he had heard nothing from his lawyer about the status of his case and asked Mr. Faccadio and his brother

---

[4]Mr. Faccadio did not speak Spanish when he first met R.G.L. He acquired whatever proficiency he had during the five years R.G.L. had been working for him.

[5]As far as this record shows, Ms. Akers did not tell R.G.L. that his daughter had already been placed in a pre-adoptive home.

to call Ms. Akers about his daughter. Ms. Akers informed Mr. Faccadio that no contact should be made directly and that all future communications regarding the child should be through the lawyers. Shortly thereafter, R.G.L. hired another lawyer who filed a petition requesting the juvenile court to set visitation and child support. The juvenile court denied the motion pending the hearing on A.G.A.P.E.'s termination petition.

At the December 16, 2002 hearing, R.G.L. presented evidence regarding his desire to gain custody of his daughter, his parenting skills, and the plans he had made to care for his daughter should the court grant him custody.[6] A.G.A.P.E. asserted that R.G.L. had abandoned S.M. by (1) failing to reimburse C.M. for her birth expenses, (2) failing to pay financial support, and (3) failing to visit. It also asserted that placing S.M. with R.G.L. would not be in her best interests because she had been living with her pre-adoptive parents for one year and because R.G.L. was an undocumented worker subject to being deported. The transcript of the hearing reflects R.G.L.'s lack of command of English. An interpreter was used during the hearing, and on several occasions, R.G.L. stated that he did not understand the questions or the proceeding. On January 21, 2003, the juvenile court entered an order terminating R.G.L.'s parental rights with regard to S.M.

## II.

A biological parent's[7] right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[8] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d at 731. While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn. Ct. App. 2000); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).

Termination proceedings in Tennessee are governed by statute. Parties seeking to terminate a biological parent's parental rights must prove two things. First, they must prove the existence of

---

[6] R.G.L.'s mother plans to quit her job and become the child's full-time caregiver.

[7] This right exists notwithstanding the marital status of the child's biological parents who have established or are attempting to establish a relationship with the child. *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S. Ct. 2985, 2993-94 (1983); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn. 2002) (extending the right to biological fathers who have grasped the opportunity to develop a relationship with the child); *In re Swanson*, 2 S.W.3d 180, 188 n.12 (Tenn. 1999); *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn Ct. App. 2001). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995).

[8] U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

at least one of the statutory grounds for termination.[9]  Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d at 838.  Second, they must prove that terminating the parent's parental rights is in the child's best interests.[10]  Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 473-74 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Because a decree terminating a biological parent's parental rights obliterates the parent-child relationship and, in the eyes of the law, relegates a biological parent to the role of a complete stranger to his or her child,[11] both the federal and state constitutions require an individualized determination of the existence of the required statutory grounds before the courts may terminate a biological parent's parental rights.  *Stanley v. Illinois*, 405 U.S. 645, 658-59, 92 S. Ct. 1208, 1216 (1972); *In re Swanson*, 2 S.W.3d at 188; *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).  Accordingly, Tenn. Code Ann. § 36-1-113(k) requires trial courts to enter written orders containing specific findings of fact and conclusions of law in termination cases.[12]  A trial court's failure to comply with Tenn. Code Ann. § 36-1-113(k) fatally undermines the validity of a termination order.  *In re D.L.B.*, 118 S.W.3d at 367-68; *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003).

In light of the constitutional dimension of parental rights, persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence.  Tenn. Code Ann. § 36-1-113(c).  *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re A.W.*, 114 S.W.3d at 545. This heightened standard of review prevents unwarranted termination or interference with a biological parent's parental rights.  *In re C.W.W.*, 37 S.W.3d at 473; *In re M.W.A., Jr.*, 980 S.W.2d at 622.  Evidence satisfying the clear and convincing evidence standard eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.  *In re Valentine*, 79 S.W.2d at 546; *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000).  It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the propositions sought to be established.  *In re A.D.A.*, 84 S.W.3d at 596; *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort.  First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d).  Thus, each of the trial court's specific factual findings will be presumed to be correct unless

---

[9]The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g) (Supp. 2003).

[10]The factors to be considered in a "best interests" analysis can be found in Tenn. Code Ann. § 36-1-113(i).

[11]*In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995); *In re Adoption of Dearing*, 572 S.W.2d 929, 932 (Tenn. Ct. App. 1978).

[12]Because of Tenn. Code Ann. § 36-1-113(k), trial courts may not simply make oral findings of fact from the bench and then adopt them by reference in their final order.  *In re C.R.B.*, No. M2003-00345-COA-R3-JV, 2003 WL 22680911, at *3-4 (Tenn. Ct. App. Nov. 13, 2003).

the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 546; *In re Adoption of Muir*, 2003 WL 22794524, at *2; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *9-10 (Tenn. Ct. App. June 3, 2003) (No Tenn. R. App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).[13]

## III.

The juvenile court determined that the record contains clear and convincing evidence warranting the termination of R.G.L.'s parental rights on two statutory grounds – Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-113(g)(9). We have determined that Tenn. Code Ann. § 36-1-113(g)(9) is inapplicable to R.G.L. and that the record does not contain the clear and convincing evidence of willfulness required to support a termination based on abandonment under Tenn. Code Ann. § 36-1-113(g)(1).

### A.

Tenn. Code Ann. § 36-1-113(g)(9)(A) contains six grounds for terminating the parental rights of a person who, at the time of the hearing, is not the legal parent or guardian of the child or who is not among the persons described in Tenn. Code Ann. § 36-1-117(b) or (c).[14] The Tennessee Supreme Court has determined that this statute affords legal parents a heightened level of protection concerning their parental rights and that the grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9)(A) can only be applied to persons identified in the statute. *Jones v. Garrett*, 92 S.W.3d at 839. Thus, the pivotal question is whether R.G.L. is among the class of persons against whom the grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9)(A) may be applied.

---

[13]These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 548-49; *see also Jones v. Garrett*, 92 S.W.3d at 838.

[14]These persons include: a person who has filed an action to establish parentage regarding a child who is the subject of an adoption proceeding, Tenn. Code Ann. § 36-1-117(b)(1), a biological father who has filed with the putative father registry, Tenn. Code Ann. § 36-1-117(c)(1), a biological father who has been identified by the child's biological mother in a sworn written statement or by other information which the court determines to be credible and reliable, Tenn. Code Ann. § 36-1-117(c)(2), a biological father who has claimed to be the child's biological father, Tenn. Code Ann. § 36-1-117(c)(3), a biological father whose name is recorded on the birth certificate, Tenn. Code Ann. § 36-1-117(c)(4), a biological father living openly with the child when an adoption proceeding is commenced, Tenn. Code Ann. § 36-1-117(c)(5), and a biological father who has entered into a parenting plan, Tenn. Code Ann. § 36-1-117(c)(6).

There are two reasons why Tenn. Code Ann. § 36-1-113(g)(9) does not apply to R.G.L. First, he had filed a petition to establish parentage eight months before the hearing on A.G.A.P.E.'s petition to terminate his parental rights. Tenn. Code Ann. § 36-1-117(b)(2) reflects a clear preference for determining questions of parentage before considering a petition to terminate parental rights, *Jones v. Garrett*, 92 S.W.3d at 839, and thus the trial court should have taken up and adjudicated the question of R.G.L.'s parentage before addressing the termination question. *See Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994). Second, by the time of the hearing, genetic testing had conclusively determined that R.G.L. was M.S.'s biological father, and the parties and the trial court essentially stipulated that to be the case. Under these facts, the grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9)(A) are inapplicable to R.G.L. *In re T.K.Y.*, No. M2002-00815-COA-R3-JV, 2003 WL 1733583, at *3 (Tenn. Ct. App. Apr. 2, 2003), *perm. app. denied* (Tenn. Sept. 2, 2003) (Tenn. Code Ann. § 36-1-113(g)(9) is inapplicable when the trial court heard the termination petition without considering the pending legitimation petition and the parties agreed that DNA testing established that the putative father was the child's biological father).

**B.**

For the purpose of A.G.A.P.E.'s abandonment claim, current state law defines "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a . . . pleading to terminate the parental rights of the parent(s) . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) ... either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i). In addition, Tenn. Code Ann. § 36-1-102(1)(D) defines "willfully failed to support" as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments[15] toward the support of the child." Likewise, Tenn. Code Ann. § 36-1-102(1)(E) defines "willfully failed to visit" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation."[16]

The concept of "willfulness" is at the core of the statutory definition of abandonment. For the purpose of Tenn. Code Ann. § 36-1-102(1)(A)(i), a parent cannot be found to have abandoned

---

[15]Tenn. Code Ann. § 36-1-102(1)(B) defines "token support" as support that "under the circumstances of the individual case, is insignificant given the parent's means."

[16]Tenn. Code Ann. § 36-1-102(1)(C) defines "token visitation" as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

a child unless the parent either has "willfully" failed to engage in more than token visitation or has "willfully" failed to provide more than token monetary support to the child for four consecutive months. "Willfully" is a word of many meanings, and so each use of the word must be interpreted with reference to the statutory context in which it appears. *United States v. Sanchez-Corcino,* 85 F.3d 549, 552-53 (11th Cir.1996); *In re Adoption of Muir*, 2003 WL 22794524 at *5; GEORGE W. PATTON, A TEXTBOOK ON JURISPRUDENCE 313 n. 2 (4th ed.1972) (suggesting that use of the word should be avoided because of its ambiguities).

"Willfulness" does not require the same standard of culpability required by the penal code. *G.T. v. Adoption of A.E.T.*, 725 So. 2d 404, 409 (Fla. Dist. Ct. App. 1999). Nor does it require malevolence or ill will. *In re Adoption of a Minor*, 178 N.E.2d 264, 267 (Mass. 1961). Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. *In re Mazzeo*, 131 F.3d 295, 299 (2d Cir. 1997); *United States v. Phillips*, 19 F.3d 1565, 1576 (11th Cir. 1994); *In re Adoption of Earhart*, 190 N.E.2d 468, 470 (Ohio Ct. App. 1961); *Meyer v. Skyline Mobile Homes*, 589 P.2d 89, 97 (Idaho 1979). Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to support a child is "willful" when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.[17] *Shorter v. Reeves*, 32 S.W.3d 758, 760 (Ark. Ct. App. 2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 574 A.2d 649, 652 (Pa. Super. Ct. 1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982). Failure to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation to perform his or her duty to support, *In re Adoption of Lybrand*, 946 S.W.2d 946, 950 (Ark. 1997), or amounts to a significant restraint or interference with the parent's efforts to support or develop a relationship with his or her child. *In re Serre*, 665 N.E.2d 1185, 1189 (Ohio Ct. C.P. 1996); *Panter v. Ash*, 33 P.3d 1028, 1031 (Or. Ct. App. 2001).[18] Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for failing to financially support a child. *Bateman v. Futch*, 501 S.E.2d 615, 617 (Ga. Ct. App. 1998); *In re Leitch*, 732 So. 2d 632, 636 n.5 (La. Ct. App. 1999).

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess

---

[17]A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Pierce v. Bechtold*, 60 Tenn. App. 478, 487, 448 S.W.2d 425, 429 (1969).

[18]Conduct that amounts to a significant restraint or interference with a parent's efforts to support or develop a relationship with a child includes (1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child. *In re S.A.B.*, 735 So.2d 523, 524 (Fla.Dist.Ct.App.1999); *In re Adoption of Children by G.P.B., Jr.*, 161 N.J. 396, 406, 736 A.2d 1277, 1282 (N.J.1999); *Panter v. Ash*, 33 P.3d at 1031.

intentions or motivations. *American Cable Corp. v. ACI Mgmt., Inc.*, No. M1997-00280-COA-R3-CV, 2000 WL 1291265, at *4 (Tenn. Ct. App. Sept. 14, 2000) (No Tenn. R. App. P. 11 application filed). Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. *See Johnson City v. Wolfe*. 103 Tenn. 277, 282, 52 S.W. 991, 992 (1899); *Absar v. Jones*, 833 S.W.2d 86, 89-90 (Tenn. Ct. App. 1992); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983); *see also In re K.L.C.*, 9 S.W.3d 768, 773 (Mo. Ct. App. 2000).

A.G.A.P.E.'s decisions to file three termination petitions somewhat complicate identifying the proper four-month period to be considered under Tenn. Code Ann. § 36-1-102(1)(A)(i).[19] Each of the petitions alleged that R.G.L. had willfully failed to visit and support S.M. for four consecutive months immediately preceding the filing of the petition. Viewing the petitions together, A.G.A.P.E. is essentially asserting that R.G.L. has willfully failed to visit or support S.M. since November 15, 2001.

We turn first to the four-month period immediately preceding the filing of A.G.A.P.E.'s original petition. R.G.L. did not willfully fail to support or visit S.M. during this entire period because he had a justifiable reason not to – he believed that S.M. had died. This belief was reasonable because he received this information from C.M., the child's own mother, and other members of her family. While A.G.A.P.E. insinuates otherwise, R.G.L. did not have an obligation to launch an independent investigation to determine whether C.M. and her mother were telling him the truth. He was justified in believing the child's own mother.

We turn next to the period from February 20, 2002, when R.G.L. first met with Ms. Akers and December 16, 2002, the date of the termination hearing. It is undisputed that R.G.L. neither visited nor financially supported S.M. during this time. The reasons for this are plain and straightforward. First, A.G.A.P.E. was not promoting the development of a relationship between R.G.L. and S.M. because it knew that doing so would undermine the placement and the planned adoption. Rather than voluntarily cooperating or assisting R.G.L., A.G.A.P.E. essentially took the position to force R.G.L. to litigate if he desired to develop a relationship with his child. Accordingly, A.G.A.P.E.'s advice to R.G.L. was to hire a lawyer and file suit. R.G.L. followed A.G.A.P.E.'s directions. He hired a lawyer within days after his meeting with Ms. Akers, and his lawyer filed a petition to establish parentage less than one month later.

R.G.L. has a limited education and a limited command of English. It is unclear precisely how much of the process put in motion by A.G.A.P.E. he understood. The record contains no evidence that he has refused to comply with any court order or that he has not diligently pursued establishing a relationship with S.M. through the courts. He cannot be held responsible for the juvenile court's failure to dispose of his petition to establish parentage in a timely manner. Had the juvenile court done so and ordered R.G.L. to begin paying child support, there is no indication in the record that he would have refused to do so. Accordingly, we have determined that R.G.L. has a justifiable

---

[19] A.G.A.P.E.'s original petition was filed on March 15, 2002. Its first amended petition was filed on June 17, 2002, and its second amended petition on October 18, 2002.

excuse for failing to support and visit S.M. between the filing of A.G.A.P.E.'s original termination petition and the final hearing.

Based on this record, we have determined that A.G.A.P.E. has failed to present clear and convincing evidence that R.G.L. abandoned S.M. by willfully failing to support or visit her. Because A.G.A.P.E. has failed to establish at least one statutory ground for terminating R.G.L.'s parental rights, it is unnecessary and premature to determine whether the record contains clear and convincing evidence that terminating his parental rights would be in S.M.'s best interests.

## IV.

We vacate the portion of the January 21, 2003 order terminating R.G.L.'s parental rights with regard to S.M. and remand the case to the juvenile court for further proceedings consistent with this opinion. Our action does not disturb the juvenile court's orders naming A.G.A.P.E. as S.M.'s guardian. The costs of the appeal are taxed to The Association for Guidance, Aid, Placement and Empathy for which execution if necessary may issue. Pursuant to Tenn. R. App. P. 42(a), the mandate in this case shall issue thirty days following the filing of this opinion.

_____
WILLIAM C. KOCH, JR., P.J., M.S.