# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
January 18, 2012 Session

## IN RE: ANGELA T., EKENE T., and EMBER T.

**Direct Appeal from the Chancery Court for Madison County**
**No. 56951      William C. Cole, Chancellor by Designation**

---

**No. W2011-01588-COA-R3-PT - Filed February 23, 2012**

---

This appeal involves a petition to terminate parental rights that was filed in 2005. At the hearing, the Father consented to the termination of his parental rights, so the trial court entered an order terminating his parental rights without making findings of fact and conclusions of law regarding grounds for termination and the children's best interest. Father subsequently challenged the trial court's order on appeal, and the Supreme Court reversed and remanded for the trial court to hold a new hearing and prepare an order with the requisite findings. On remand, the trial court found that Father had not abandoned the children by willfully failing to visit them or by willfully failing to support them, and therefore it declined to terminate his parental rights. We reverse and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., joined and HOLLY M. KIRBY, J., concurred in part and dissented in part.

Michael A. Carter, Milan, Tennessee, for the appellants, Siegfried T. and Vernessa T.

Bede Anyanwu, Jackson, Tennessee, for the appellee, Ifeatu E.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

Ifeatu E. ("Father") and Vernessa T. ("Mother") were divorced in 2001.  They had three daughters: Angela, Ekene and Ember.  The children were ages seven, five, and two when the final decree of divorce was entered.  Mother was named primary residential parent.  The divorce decree provided that before Father could have overnight visitation with the children, he was required to demonstrate that he had a suitable location for such visitation to occur, with adequate beds, restrooms, and "normal living facilities."  The court specifically found that Father's unfinished house in College Grove, Tennessee, was not suitable for such visitation, and neither was his medical clinic.

Father and Mother are both physicians.  The final decree of divorce found that Father was voluntarily underemployed, stating that "Father is a neo-natologist and has extensive skills and training and has more training and experience than the Mother; [and] that the Father is capable of earning at least the amount of money earned by the Mother, who is a pediatrician, employed in the public sector, less specialized than Father[.]" The trial court set Father's child support obligation at $2,500 per month based on his "ability to earn," and it also ordered him to pay Mother $84 per month for the cost of the children's medical insurance.  Father appealed to this Court, challenging numerous aspects of the trial court's order, but it was affirmed in most respects.

Mother married Siegfried T. ("Stepfather") in June 2002.  In July 2002, Mother filed a petition for contempt, alleging that Father had failed to pay child support and various expenses as required by the final decree of divorce, and that exchanges for visitation had been very difficult, with "words passed" between the parties.  Following a hearing which Father did not attend, the trial court entered an order on August 16, 2002, finding Father in civil contempt.[1]  The court found that Father had failed to pay child support and the children's medical insurance costs, among other things, and that Father had the ability to pay the ordered support but had "failed and refused to do so."  The court explained that Father was in the process of building another home in Jackson, Tennessee, in addition to the home that he owned "free and clear" in College Grove.  The court ordered that Father be taken into custody until he paid $10,860 to purge himself of contempt.  The order also stated:

> The Court further heard testimony pertaining to the circumstances of visitation and the parties' minor children which indicated that the children might suffer

---

[1]  The order noted that Father failed to appear at the hearing despite the trial court's continuance of the matter for two hours.

irreparable harm when they are in the custody and control of [Father]. The Court finds that it is in the best interest of the children and for their protection and safety that [Father's] visitations with the parties' minor children be suspended until further Orders of the Court. [Father] may file a Petition with the Court to have a hearing thereon at his earliest convenience.

Father paid the funds required to purge himself of contempt shortly after the order was entered. Approximately two months later, he filed a *pro se* petition to have his child support obligation reduced to "the unemployment minimum" or suspended altogether, claiming that he had been evicted from his medical office and that he was in search of employment. However, Father's motion did not mention the issue of visitation. Mother filed a response, and later, she filed a motion to dismiss Father's petition to reduce his child support obligation, stating that Father had failed to appear at the hearing on his motion.

In July 2003, nearly one year after Father's visitation rights were suspended, he filed, through counsel, a response to Mother's motion to dismiss his petition regarding child support, along with a "Petition to Reinstate Visitation." However, in March 2005, Father's counsel filed a motion to withdraw, stating that he had had no contact with Father since December 9, 2004, "despite repeated efforts to contact him." Counsel's motion to withdraw stated that he had received returned mail from Father's last known address marked "no longer at this address," and that Father had failed to appear at a hearing and failed to return his telephone calls. The trial court entered an order allowing Father's counsel to withdraw in March 2005.

On July 5, 2005, Mother filed a petition to terminate Father's parental rights, alleging that Father had had no contact with the children in over two and a half years and that he was approximately $57,000 in arrears in child support. The petition stated that the children had been in the care and custody of Mother continuously since the August 2002 order suspending Father's visitation. On September 7, 2005, Mother filed an "Amended Petition for Termination of Parental Rights and Petition for Adoption by a Step Parent." The petition alleged that grounds for terminating Father's parental rights existed because Father had abandoned the children by willfully failing to visit them. Mother also filed a petition for contempt due to the child support arrearage owed by Father.

Following a hearing, the trial court entered an order on April 25, 2007, stating that Father had testified under oath at the hearing that he wished to surrender his parental rights and that termination of his parental rights and adoption was in the children's best interest. As a result, the trial court entered an order terminating Father's parental rights and approving the adoption by Stepfather. Approximately three weeks later, Father filed a petition challenging the order, claiming that he was under duress at the hearing and that there were

procedural flaws in the process. After the trial court denied Father's petition, he appealed to this Court, and eventually to the Tennessee Supreme Court. The Supreme Court held that a trial court's written order of termination must contain the statutorily required findings of fact and conclusions of law, identifying which ground(s) for termination exist and determining whether termination of parental rights is in the best interest of the children, even where the parent consents to the termination of parental rights. *In re Angela E.*, 303 S.W.3d 240 (Tenn. 2010). Because the trial court's order did not contain the requisite findings, the Court reversed and remanded for a new hearing and the preparation of a written order that complied with the statutory requirements based on the evidence introduced.

On remand, the trial court heard testimony over the course of two days, after which it entered an order finding that Mother had not demonstrated grounds for terminating Father's parental rights. The court found that Father had not abandoned the children by willfully failing to visit or willfully failing to support them. Accordingly, it entered an order dismissing the petition for termination and for adoption. Mother and Stepfather timely filed a notice of appeal.

## II. ISSUES PRESENTED

On appeal, Mother and Stepfather argue that the trial court should have concluded that Father abandoned the children by either willfully failing to visit them or willfully failing to support them. Father asserts that the trial court was correct in finding that neither ground was applicable.[2]

---

[2] Although neither party mentions this issue on appeal, we note that the amended petition for termination of parental rights only alleged the ground of "abandonment of said child[ren] by reason of willfully failing to visit[.]" It alleged that Father owed $57,000 in child support, but it did not mention abandonment by willful failure to support. Nevertheless, both parties discussed this issue during opening statements as if it had been alleged in the petition, and extensive proof was introduced before the trial court regarding this issue. Because this issue was in fact tried by the trial court, we will consider the petition amended to include this ground for termination pursuant to Tennessee Rule of Civil Procedure 15.02. *See State v. McCrary*, No. W2005-02881-COA-R3-JV, 2006 WL 1864502, at *8 n.2 (Tenn. Ct. App. July 6, 2006) (finding that the parties tried by consent a ground for termination that was not alleged in the petition); *In re S.M.N.*, No. E2005-01974-COA-R3-PT, 2006 WL 1814852, at *6 (Tenn. Ct. App. June 30, 2006) (same); *Weatherford v. Weatherford*, No. W1999-01014-COA-R3-CV, 2000 WL 1891057, at *3 (Tenn. Ct. App. Dec. 29, 2000) (same); *compare In re Landon H.*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *6 (Tenn. Ct. App. M.S. Jan. 11, 2012) (considering whether an unpled ground was tried by consent but ultimately concluding that it was not); *In re S.J.M.*, No. M2009-01080-COA-R3-PT, 2009 WL 4039430, at *2 (Tenn. Ct. App. 2009) (same); *Weidman v. Chambers*, No. M2007-02106-COA-R3-PT, 2008 WL 2331037, at *6 (Tenn. Ct. App. Jun. 3, 2008) (same); *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *10 (Tenn. Ct. App. Apr. 29, 2005) (same).

### III. STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. *Id.* at 860–61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the

finding to be correct unless the evidence preponderates against it. *Id.* Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. *Id.* Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Abandonment

The first ground for termination listed in the statute, and the one most frequently relied upon, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862. For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)-(v). Pursuant to the first definition, which is the one relevant to this case, "abandonment" means that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). Abandonment can be established by showing that a parent *either* willfully failed to visit *or* willfully failed to support the child during the relevant time period. *In re Adoption of McCrone*, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003). The willful failure to visit, support, or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the termination petition currently before the court. *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003).

### 1. Willful Failure to Visit

The central issue on appeal regarding Father's failure to visit is whether his actions were willful. Failure to visit a child for four months does not constitute abandonment if it was not willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). "The requirement that the failure to visit or support be 'willful' is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV,

2005 WL 1046796, at *17 (Tenn. Ct. App. W.S. May 4, 2005).  Therefore, the element of willfulness is essential, and central to the determination of abandonment.  ***In re M.L.D.***, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); ***In re C.M.C.***, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005).

Where a parent has been thwarted in visitation efforts by circumstances beyond his control, courts have refused to find willful abandonment.  ***In re F.R.R., III***, 193 S.W.3d at 530.  However, willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent have acted with malice or ill will.  ***In re Audrey S.***, 182 S.W.3d at 863; *see also **In re S.M.***, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004).  Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts.  ***Id.*** Willful conduct is the product of free will rather than coercion.  ***Id.***  A person acts willfully if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.  ***Id.*** at 863-64.  "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."  ***Id.*** at 864 (citing *In re M.J.B.*, 140 S.W.3d at 654).

Willfulness of a parent's conduct depends upon the person's intent, and intent is seldom capable of direct proof.  ***In re Audrey S.***, 182 S.W.3d at 864 (citing *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec.6, 2004)).  Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct.  ***Id.***  A person's demeanor and credibility as a witness also play an important role in determining intent.  ***In re Adoption of Muir***, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003).  Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are the proper courts to make a determination of willfulness.  ***In re D.L.B.***, 118 S.W.3d at 367.  The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness.  ***V.D. v. N.M.B.***, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004).

In the case before us, Mother filed her original petition to terminate Father's parental rights on July 5, 2005, and she and Stepfather filed the amended petition for termination and adoption on September 7, 2005.  It is undisputed that Father had had no contact with the children for nearly three years, since the order was entered suspending his visitation on August 16, 2002. Due to the entry of that order, Father contends that his failure to visit the

children cannot be deemed willful.[3]  Mother and Stepfather argue that Father's failure to visit should be deemed willful despite the entry of the August 2002 order suspending his visitation.  They point out that the order suspending Father's visitation[4] stated:

> The Court further heard testimony pertaining to the circumstances of visitation and the parties' minor children which indicated that the children might suffer irreparable harm when they are in the custody and control of [Father]. The Court finds that it is in the best interest of the children and for their protection and safety that [Father's] visitations with the parties' minor children be suspended until further Orders of the Court. *[Father] may file a Petition with the Court to have a hearing thereon at his earliest convenience.*

(emphasis added).  Two months after the order was entered, Father, acting *pro se*, filed a petition to reduce his child support obligation; however, his petition did not mention the issue of visitation.  Approximately one year after the order was entered, in July 2003, Father filed, through counsel, a petition to reinstate visitation.  However, his attorney withdrew from his representation of Father in March 2005, stating that Father had failed to appear at a recent hearing and that counsel had lost contact with Father "despite repeated efforts to contact him" through mail and telephone calls.  Father testified at trial that he had moved to Fresno, California, in the fall of 2004.  Again, Mother filed the original petition to terminate parental rights in July 2005, and the amended petition in September 2005.

Father did not offer a clear explanation as to why he did not actively pursue seeking relief from the order suspending his visitation.  Father testified that after his visitation was suspended, he "quickly started looking for an attorney to correct all of this going on here in Madison County with my kids," as he was "very adamant about that to re-establish visitation

---

[3]  We recognize that the statutory definition of "abandonment" requires us to focus on the "period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" However, in determining whether a parent's conduct was "willful," it may become necessary in a given case to evaluate events occurring prior to the start of the four month period.  In other words, events occurring prior to the four month period may bear on the "willfulness" of the parent's conduct during the four month period. *See In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *6 (Tenn. Ct. App. Nov. 15, 2011) ("courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child"); *see also In re Keri C.*, No. E2010-00381-COA-R3-PT, 2010 WL 4739706, at *16 (Tenn. Ct. App. W.S. Nov. 22, 2010) (explaining that the parent's conduct and relationship with the child prior to the four month period is "relevant background and context for the necessarily fact-intensive evaluation" of the parent's visitation during the four month period).

[4]  As previously noted, Father did not appear at the hearing that led to the suspension of his visitation.

with my kids." However, Father also testified that after his visitation was suspended, he "went back to Nigeria to spend time." He testified that upon his return, he tried to see his children at their schools on several occasions but was turned away by the school principals due to the order suspending his visitation. Father acknowledged that he filed a *pro se* petition to reduce his child support obligation in November 2002. He also testified that he withdrew money from his retirement savings to hire the attorney who filed the petition to reinstate visitation in July 2003. Father moved to California around September of 2004. When asked about his attorney's withdrawal in March 2005, Father testified that he had "quite a few things that were going on then," because he had recently moved to California, remarried, and relocated again with his new wife.

In its February 2011 order, the trial court found "no dispute that the children have not had a relationship of any kind with Father since 2002." The court also found that "Father's travails in his relationship with his children are the direct result of his own actions and conduct." However, with specific regard to willful failure to visit, the court made the following conclusion:

> While the unfortunate events that have befallen these children can be laid squarely at the feet of Father by his conduct and actions, the evidence does not demonstrate and the Court cannot find, by clear and convincing evidence and under the current state of the law in Tennessee, that the Father willfully abandoned the children by failing to visit, especially in light of the court order suspending Father's visitation.

We respectfully disagree with the trial judge's implicit conclusion that the order suspending Father's visitation precluded a finding that he willfully failed to visit.

In *State Dept. of Children's Services v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *2 (Tenn. Ct. App. Dec. 28, 2005), a father's visitation with his child was "suspended pending a favorable report from an alcohol and drug evaluation/screening of [Father]." The required testing was never completed, and the order suspending his visitation remained in place when a petition to terminate his parental rights was filed months later. *Id.* On appeal from the termination of his parental rights on the ground of abandonment, the father argued that his failure to visit could not be considered "willful" due to the entry of the order suspending his visitation. *Id.* at *5. The Court disagreed and concluded that the father's decision not to submit to the testing basically "constituted a willful decision to discontinue visiting his son." *Id.*

Similarly, *In re Elijah B.*, No. E2010–00387–COA–R3–PT, 2010 WL 5549229, at *2 (Tenn. Ct. App. Dec. 29, 2010), involved a "no-contact" order preventing a father from

visiting his children. A court ordered the father to submit to a drug test and advised him that if he passed two drug screens, the no-contact order preventing his visitation would be lifted. *Id.* Approximately two months later, the father passed a drug screen and had a single supervised visit. *Id.* One month after the visit, a petition was filed to terminate the father's parental rights due to abandonment, among other things, and his parental rights were ultimately terminated on that ground. *Id.* On appeal, the father argued that the evidence did not establish a willful failure to visit because there was a no-contact order in place for part of the relevant four-month period. *Id.* at *8. The Court rejected his argument because the father knew that if he passed the required drug tests, the no-contact order would be lifted and visitation would be permitted, yet the father did not complete the test for approximately two months. *Id.* Therefore, the existence of the no-contact order did not preclude a finding that the father's failure to visit was willful.

Here, the August 2002 order stated that due to testimony that indicated that the children might suffer irreparable harm when in Father's care, his visitation was suspended "until further Orders of the Court," and it further stated that "[Father] may file a Petition with the Court to have a hearing thereon at his earliest convenience." Father did file a *pro se* petition with the court just two months later, but he sought to reduce his child support obligation, not to pursue visitation with his children. Although Father did file a petition to reinstate visitation approximately one year after the order was entered, the record does not reflect that he actively pursued such relief, as evidenced by his attorney's motion to withdraw on the basis that Father had failed to appear at a hearing, failed to return his telephone calls, and moved from his last known address. Most importantly, Father took absolutely no action to pursue visitation with the children during the relevant four month period preceding the filing of the termination petition. By that time, Father had had no contact with the children in nearly three years. Clearly, this is not a case where a parent was aggressively trying to maintain a relationship with his children by focusing his efforts in the courts. *Compare In re A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (finding that although the parents did not visit during the four month period, they were actively pursuing legal proceedings to regain custody); *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *6 (Tenn. Ct. App. Apr. 27, 2007) (finding that the father was actively pursuing a court order to establish visitation rights and that his pursuit of a judicial remedy was inconsistent with a finding that he willfully failed to visit). Again, intent is usually incapable of direct proof, so we must look to circumstantial evidence such as the parent's actions or conduct in order to determine "willfulness." *In re R.L.F.*, 278 S.W.3d at 320. "[W]hile the parent's subjective intent and interest in the child is relevant, the termination statutes generally require that such interest manifest in the form of objectively reasonable action geared toward establishing a

healthy parental relationship."[5] *In re Keri C.*, 2010 WL 4739706, at *18. We find that Father's intentional or voluntary acts, or failures to act, in this case, clearly and convincingly demonstrate that he abandoned the children by willfully failing to visit them for a period of four consecutive months preceding the filing of either petition for termination. As such, Mother and Stepfather demonstrated at least one ground for terminating Father's parental rights.[6]

## 2. Willful Failure to Support

Next, we will consider whether Father's failure to financially support the children in accordance with his child support obligation also qualifies as "abandonment." As previously discussed, the termination statute defines "abandonment" as occurring when the parent has either willfully failed to visit *or* "willfully failed to support" *or* "willfully failed to make reasonable payments toward the support of the child" during the relevant four month period preceding the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). Again, the element of willfulness is central to our analysis.

The 2001 divorce decree ordered Father to pay $2500 per month in child support. It also ordered him to pay $84 per month for the children's health insurance premium. The divorce court found that Father was voluntarily underemployed but it based this amount upon

---

[5] We acknowledge that a person's demeanor and credibility as a witness play an important role in determining intent, *In re Adoption of Muir*, 2003 WL 22794524, at *5, and because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d at 367. Nonetheless, the trial court in this case did not make any credibility findings to suggest that Father did not willfully fail to visit. In fact, the court stated that "Father's travails in his relationship with his children are the direct result of his own actions and conduct," and that "the unfortunate events that have befallen these children can be laid squarely at the feet of Father by his conduct and actions." The court also stated that it "questions whether Father is more motivated in this matter out of a genuine concern for his children or his disdain at having his children call [Stepfather] 'Daddy.'" Thus, it appears to us that the trial court believed that the order suspending Father's visitation excused him from making further efforts to see his children.

[6] Our Supreme Court has instructed the Court of Appeals to review the trial court's findings of fact and conclusions of law as to each ground for termination, even though the statute only requires the finding of one ground to justify terminating parental rights, in order to further the policies of permanently placing children, reaching just and speedy resolutions of cases, and preventing unnecessary remands of cases heard by the Supreme Court. *In re Angela E.*, 303 S.W.3d at 251 n.14.

his "ability to earn" at least as much as Mother, who was earning $121,000 per year.[7] When Father appealed that decision, we stated that, "[b]ased on Father's educational level and prior work experience, the trial court was clearly justified in finding that Father was voluntarily underemployed, and conservative in determining that his potential income was the same as Mother's compensation as a pediatrician."

Father contends that his failure to pay support cannot be considered willful, claiming that he paid what he was able to pay. Father is a board-certified neonatologist, but he points out that he was unemployed from around August of 2002 until September of 2004.[8] He testified that after he was evicted from his medical office in August 2002, he "took a little bit of leave," and when he checked his medical license "a few months after that" he realized that it had expired. Father testified that when he attempted to renew his medical license, he was informed that because he had not attempted to do so within the applicable time frame after expiration, he would have to reapply for his medical license and go through the application process all over again. Father testified that that process took so long that he eventually moved to California, where he had been licensed for many years. Father began working in California in September of 2004 for a starting salary of $120,000 per year. Father testified that at that time he was also doing some work for another medical group so that his combined income was somewhere between $120,000 and $150,000 a year. Father testified that he was promoted to medical director and overseeing 25 employees within six months of his hiring, which would have been around March of 2005, but he did not expressly mention whether he received an increased salary. Father also conceded that while he was unemployed, his home in College Grove was sold, and Father received over half a million dollars from that sale. He used approximately $300,000 to $350,000 of that money to begin building a new house in Jackson, Tennessee, which Father himself described as "humongous," with just one of its four fireplaces costing $40,000.

Despite Father's employment in California beginning around September of 2004, and the fact that he was building another house, Father did not pay any child support in the 2004 calendar year. Beginning in January 2005, he paid some child support in some months, but

---

[7] As stated above, the trial court found that "Father is a neo-natologist and has extensive skills and training and has more training and experience than the Mother; [and] that the Father is capable of earning at least the amount of money earned by the Mother, who is a pediatrician, employed in the public sector, less specialized than Father[.]"

[8] Although Father testified that he was evicted from his medical office in August 2001, the technical record contains the detainer warrant that was attached to Father's motion to reduce his child support obligation, and that warrant is dated August 30, 2002.

he never paid $2500 per month as ordered. In some months, he paid nothing at all, and he never paid any of the children's health insurance premiums. The original termination petition was filed on July 5, 2005. During the preceding four months, Father paid no child support in March, $1000 in April, $1000 in May, no child support in June, and $1500 on July 3, just before the termination petition was filed. Therefore, of the $10,000 in child support that he owed for the four month period, Father paid $3500. He did not pay any of the amount owed for the children's health insurance during that time, and he did not make any payments toward back child support.

Beginning in August 2005, *after* the original petition to terminate his parental rights was filed on July 5, Father began paying $2500 per month as ordered, at least for seven of the next eight months. Thus, Father asks this Court to consider the four-month time period preceding the filing of the *amended* petition for termination and adoption, which was filed on September 7, 2005. This we decline to do. We recognize that "the willful failure to visit, support, or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the petition currently before the court." *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). However, Tennessee Code Annotated section 36-1-102(1)(F) provides that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]". The Supreme Court has held that this statute is ambiguous in providing that abandonment may not be repented of after the filing of "any" termination petition. *In re D.L.B.*, 118 S.W.3d at 366. In *In re D.L.B.*, the Court was confronted with the situation where a termination petition was filed by CASA in juvenile court and later dismissed, and another termination petition was filed by prospective adoptive parents in chancery court, which led to the termination of a father's parental rights. *Id.* at 362. Because the aforementioned statute says that abandonment may not be repented of after the filing of "any" termination petition, the *chancery* court looked to the four-month period preceding the filing of the petition in *juvenile* court, which had been dismissed, for purposes of determining whether the father abandoned the child. *Id.* at 364. On appeal, the Court found the statute ambiguous and looked at the entire statutory framework for parental termination cases in order to determine the legislature's intent. *Id.* at 366. The Court ultimately concluded that "the word 'any' is addressed only to petitions presently under the court's consideration," explaining:

> This interpretation best effectuates legislative intent without unduly impinging upon the fundamental rights of parents. Clearly, the legislature did not intend that parents be able to repent of their abandonment after a petition currently under consideration is filed. However, there is no indication that the legislature intended that conduct occurring prior to dismissal of an earlier petition to terminate parental rights that was brought by one party should be used as a

-13-

ground for terminating parental rights in a subsequent proceeding initiated by another party. Accordingly, we hold that only a parent's conduct in the four months immediately preceding the filing of a petition then before the court may be used as grounds to terminate parental rights under Tennessee Code Annotated section 36–1–102(1)(A)(i).

*Id.*

Here, the original petition filed in July 2005 alleged that Father had abandoned the children by willfully failing to visit, support, or make reasonable payments toward the support of the children. The amended petition filed in September 2005 added the petition for adoption by Stepfather. Like the original petition, the amended petition also alleged that Father had abandoned the children by willfully failing to visit them, and it alleged that Father was $57,000 in arrears in child support, although it did not expressly allege abandonment by failure to support.[9] Both petitions were filed by Mother, in the same court, during the same proceeding. Under these circumstances, we find that Father's payments of child support after the original petition was filed should not be considered for purposes of the abandonment analysis. Tennessee Code Annotated section 36-1-102(1)(F) "precludes consideration of [a parent's] 'after-the-fact' efforts to thwart termination of his parental rights." *In re S.R.M.*, No. E2008-01359-COA-R3-PT, 2009 WL 837715, at *12 (Tenn. Ct. App. Mar. 27, 2009). Because the original petition was filed in the same proceeding presently under the court's consideration, and it would frustrate the legislative intent to allow Father to repent of abandonment by resuming support after the original petition was filed, we will look to Father's actions during the four-month period prior to the original petition for purposes of the abandonment analysis.

In the four months preceding the July 5, 2005 petition, Father paid approximately one-third of what he owed in child support for those same months. During that time, Father was employed in California and receiving an annual salary of at least $120,000. He also owned property in Madison County, Tennessee, that was worth, by his own estimation, at least $300,000 to $400,000, with no mortgages or liens on the property.[10] Under the relevant statutes, "abandonment" occurs when a parent "willfully failed to support" *or* "willfully failed to make reasonable payments toward the support of the child[.]" Tenn. Code Ann. §

----

[9] As previously discussed, even though abandonment by failure to support was not expressly alleged in the amended petition, we find that it was tried by consent of the parties.

[10] Father testified that the value of the property was between $300,000 and $400,000 during the fall of 2004. At the time of trial in 2011, the home was unfinished, but Father testified that he had already invested $600,000 in the home. Although it is not clear how much the home was worth during the relevant four-month period in mid-2005, it was at least worth $300,000 to $400,000.

36-1-102(1)(a)(i). Willful failure to support or to make reasonable payments toward support means "the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "'[T]oken support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). In termination proceedings, "the term 'token support' is a term of art." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 (Tenn. Ct. App. Jun. 3, 2003). A finding that support was "insignificant" in light of the parent's "means" must be based upon evidence regarding both the parent's actual financial support of his or her child and the parent's "means." *Id.* "The word 'means' in this context connotes '[t]he resources at (one's) disposal for effecting some object; chiefly, (a person's) pecuniary resources viewed with regard to their degree of adequacy to (his) requirements or habits of expenditure.'" *Id.* at *11 n.24 (quoting 9 *The Oxford English Dictionary* 517 (2d ed. 1989)).

Our research has not revealed another termination case classifying payments comparable in size to those made by Father as "token support." Indeed, in most termination cases, the payments made by Father would be "significant" because parents in termination cases often have little to no income. Nevertheless, "[t]he definition of token support itself requires consideration of the circumstances of the individual case." *In re K.C.*, No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *9 (Tenn. Ct. App. Oct. 4, 2005). Considering Father's substantial salary and the value of his unencumbered property, the child support payments he made for his three children during the relevant four-month period can only be described as insignificant given his means.

Having reviewed the entire record in this case, we find that the evidence clearly and convincingly establishes that Father abandoned his children by willfully failing to make reasonable payments toward their support. As such, grounds exist for the termination of Father's parental rights.

## V. CONCLUSION

Because the trial court found that grounds for termination did not exist, it did not reach the issue of whether termination would be in the best interest of the children. Because we reverse the trial court's finding that Father had not abandoned the children, we must remand this cause to the trial court for further proceedings, to include a consideration of whether termination of Father's parental rights is in the best interest of the children, utilizing the factors set forth in Tennessee Code Annotated section 36-1-113(i). Costs of this appeal are taxed to the appellee, Ifeatu E., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.