IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2012

IN RE ALEXIS M.M.

Appeal from the Juvenile Court for Sullivan County
No. J15478      J. Klyne Lauderback, Jr., Judge

_____

No. E2012-00022-COA-R3-PT-FILED-AUGUST 20, 2012

_____

Jason C. ("Putative Father") appeals the termination of his parental rights to his minor child, Alexis M.M. ("the Child"). The Department of Children's Services ("DCS") pursued termination after Putative Father was incarcerated and the Child was adjudicated dependent and neglected in the care of her mother, LeAnn M. ("Mother"). Following a bench trial, the court applied Tenn. Code Ann. § 36-1-113(g)(9)(A), applicable to non-legal parents, and terminated Putative Father's rights based upon multiple grounds, including the failure to provide child support, to visit, or to establish his paternity. Putative Father challenges the sufficiency of the evidence supporting each of these grounds. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Katherine L. Tranum, Kingsport, Tennessee, for the appellant, Jason C.

Robert E. Cooper, Jr., Attorney General and Reporter, and Joshua Davis Baker, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

On March 3, 2011, DCS filed a petition to terminate Putative Father's rights.[1] By the time of the October 2011 trial, the Child, age seven, had been in state custody for just over two years.

The Child was born to Mother on August 8, 2004. At that time, Mother was still married to Tim A., the father of her three older children, but she was living with Putative Father and all four of her children.[2] Mother refused to identify the father on the Child's birth certificate. Mother later related to her case manager that she became pregnant while she and Putative Father were living together and "that's how she knew he was the father." Mother immediately advised Putative Father that the Child was his. Putative Father did not attend the Child's birth, but always held himself out as her father.

Mother and Putative Father had a tumultuous relationship that included multiple incidences of domestic violence and ongoing involvement with the Virginia Department of Social Services. According to Megan Hunt, the family's case worker in Virginia, she provided assistance including domestic violence classes for Mother and counseling for the children who had witnessed Putative Father assaulting Mother. Ms. Hunt testified that although her department obtained a protective order prohibiting Putative Father from being in the home with the Child, she continued to observe him in and around the home. In January 2008, Ms. Hunt made an unannounced visit and found Mother in the process of leaving with the children. Mother "had been beaten pretty bad. Her tooth was through her lip, her head was busted open" and the children were all "very upset." According to Ms. Hunt, Mother told her there had been other incidences of abuse against her and "she was through with him and wanted to move on," yet she continued to allow him in the home. Ms. Hunt said the order of protection was abated by a Virginia court when the family moved to Tennessee. Questioned about Putative Father's paternity status, Ms. Hunt said it was never discussed or established, but was "just kind of understood" and the local court had treated him as the Child's father.

---

[1]DCS's petition also sought to terminate the parental rights of the Child's mother and those of a Mr. A. as to four children – the Child and her three half-siblings. The children's cases were consolidated for trial. Neither the child's mother nor Mr. A. appeared at trial and default judgments were entered against both. Putative Father did appear and testified. The instant appeal concerns only Putative Father and the Child; we refer to Mother and the others only as is necessary to recite the relevant underlying facts.

[2]The precise time frame is not clear, but the record indicates that the family lived in the state of Virginia during some portion of the time period from 2004 to 2009.

In July 2009, Putative Father was incarcerated; Mother and the children returned to Tennessee. Three months later, on September 28, 2009, law enforcement officers were summoned to the four children's school because they were suffering from the flu and Mother could not be located. Officers went to their home and found that the Child, her siblings, and Mother were living in disarray. There was no adult present to take custody of the children, and officers observed no door knob on the front door. They also saw drugs and drug paraphernalia. The Child and her siblings were taken into protective custody and subsequently adjudicated dependent and neglected.

Putative Father remained incarcerated until January 2010. The Child's DCS case manager, Marsha Carrier, testified that Putative Father contacted her in 2010. He was aware that the Child was in state custody and expressed an interest in arranging visitation. According to Ms. Carrier, he "wanted to know how to get visitation and [knew] that he needed to do a DNA test." In all, Putative Father called her once in February and twice in March, the last time to request visitation around Easter. In their conversations, Ms. Carrier explained that DCS would not permit visitation because Putative Father had not provided proof that he was the Child's father – as previously noted, he was not named on the Child's birth certificate and Mother was still married to Mr. A; therefore, Mr. A. was presumed to be the Child's father. She explained to Putative Father "several times" the various steps that needed to be taken to establish paternity and offered to contact the Child Support Enforcement Division to see if they could cover the expense of a DNA test. According to Ms. Carrier, the Child Support Enforcement Division declined to provide testing for Putative Father prior to first testing the Child's legal father, Mr. A., whom they were unable to locate. Thus, if Putative Father wanted a DNA test, he would have to pay for it himself.

Ms. Carrier told Putative Father that he had another option; he could notify the court that he was the possible father and request a DNA test and he could file with the Putative Father Registry. She stated that she prepared all the forms and contact information to give to Putative Father, but "he opted to do the DNA testing." On Putative Father's inquiry, Ms. Carrier told him the DNA test typically cost between $300-$400. Putative Father told Ms. Carrier that he would have the necessary funds after he received his income tax refund the following month and that he would then pursue the test on his own. Ms. Carrier told Putative Father to let her know when he was ready so she could make the Child available for testing. She informed Putative Father that once his paternity was established, DCS would include him in the Child's permanency plan.[3]

---

[3]The Child's permanency plan references Putative Father only to state that he "needs to complete paternity testing" and "needs to maintain contact with DCS."

Putative Father was again incarcerated in June 2010. In March 2011, Ms. Carrier visited him in jail and advised him that paternity still needed to be established, but that the Child Support Enforcement Division would not pay for the DNA test. Ms. Carrier did not hear from Putative Father again. He neither filed a petition to establish paternity of the Child nor indicated on the Putative Father Registry that he was the Child's father. She testified she was not aware of any contributions that Putative Father made toward Mother's prenatal or post-delivery expenses or any child support payments by him since DCS took custody.

While in foster care, the Child was diagnosed with ADHD and "oppositional defiance disorder" for which she was receiving therapy. In addition, she was following a specialized education plan developed for her at her school. The Child had shared the same foster home with her siblings for nearly two years and they had done well and enjoyed an active life. Although their home was not pre-adoptive, DCS was in the process of finding a permanent home for them. Ms. Carrier felt that Putative Father had failed to develop a meaningful relationship with the Child and believed placing custody with him would have a detrimental effect on the Child. Instead, she believed it best for the Child and her siblings to remain in "a safe and stable environment[] like they have been, to excel in all aspects of their lives."

Putative Father testified that he was part of the Child's life and supported not only her but Mother's other children until he was incarcerated in July 2009 and that the children were soon thereafter removed to DCS custody. After his release, he called Ms. Carrier "time and time again to . . . see, where [he] could see [the Child]," but was told he had no rights to the Child. He agreed that other than speaking with Ms. Carrier, he had taken no proactive steps to secure a DNA test to help establish his paternity. Putative Father acknowledged that he told Ms. Carrier that he would pay for the DNA test with his tax refund, but said he could not afford it after he received only $84 back. He said he remembered every detail of his conversations with Ms. Carrier, but did not recall her telling him about the Putative Father Registry or about petitioning the court for a finding of paternity. He agreed that he told Ms. Carrier he would pay child support "if [he had] to," but that he never did. The proof showed that Putative Father was out of prison from January to June 2010 and lived with his mother during that time. He worked odd jobs to support himself and help his mother.

At the time of trial, Putative Father had been out a jail for about a week and was on parole. Putative Father said that he was employed with a concrete company full-time, earning over $14 an hour. He said he still lived with his mother, but was preparing to move into a mobile home he had bought. He said he completed anger management classes while living in Virginia. He said he had made efforts to get paternity established, but had no money to obtain the test and "being incarcerated didn't help either." Putative Father said the court system in Virginia had always treated him as the Child's father and he was willing to take steps and accept services his parole officer had offered, including parenting classes, in

order to see the Child and get custody. He last saw the Child in July 2009. Putative Father admitted to an extensive history of domestic violence involving the Child's mother, going back to 2003, but denied that he had abused her in the presence of the children.

At the conclusion of the hearing, the trial court terminated his parental rights pursuant to multiple provisions in Tenn. Code Ann. § 36-1-113(g)(9). Specifically, the court found that Putative Father (1) failed to make reasonable and consistent provision for the support of the Child in accordance with Tenn. Code Ann. § 36-1-113(g)(9)(A)(*ii*); (2) failed to visit or attempt to visit the Child in accordance with Tenn. Code Ann. § 36-1-113(g)(9)(A)(*iii*); and (3) failed to petition for paternity of the Child in accordance with Tenn. Code Ann. § 36-1-113(g)(9)(A)(*vi*). The trial court further found that termination of Putative Father's rights was in the best interest of the Child. In support of its ruling, the trial court elaborated:

> That pursuant to T.C.A. § 36-1-113(g)(9)(A) and subsequent sections dealing with the parent who is not the legal father, the basis for terminating the parental rights of [Putative Father] is his failure to establish paternity, DCS has proven that by clear and convincing evidence.
>
> That [Putative Father] failed to seek visitation with [the Child]. Specifically, he was out of jail for five . . . or six . . . months and failed to take affirmative steps to obtain visitation or make some contact. The proof in this case shows there was no attempt to establish visitation other than making phone calls to, or receiving phone calls from a representative of [DCS]. [Putative Father] did not, during that time, make any attempt to obtain custody of the [C]hild besides those few phone calls. There is a requirement that he do more than just make phone calls.

Putative Father timely filed notice of appeal.

II.

Putative Father raises the following issue for our review:

> The termination of Putative Father's parental rights based solely upon Tenn. Code Ann. §§ 36-1-113(g)(9) and 36-1-117(c) is contrary to the law and the evidence.

III.

We employ the following standard of review in cases involving the termination of parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

A.

Putative Father challenges the sufficiency of the evidence in support of the termination of his rights pursuant to the cited grounds in Tenn. Code Ann. § 36-1-113(g)(9)(A)(*ii*), (*iii*), and (*vi*). We address each ground in turn.

The termination of the rights of a legal parent or guardian must be based on one or more of the grounds contained in Tenn. Code Ann. § 36-1-113(g)(1)-(8). *See **In re Adoption of S.M.F.***, No. M2004-00876-COA-R9-PT, 2004 WL 2804892 (Tenn. Ct. App. M.S., filed Dec. 6, 2004). Tenn. Code Ann. § 36-1-113(g)(9)(A) sets forth additional, "less exacting" grounds for terminating the rights of a person who is not a child's legal parent or guardian at the time the termination petition is filed. *Id*. at * 6. Stated otherwise, the grounds in Section 36-1-113(g)(9)(A) apply only to cases in which there is no legally established relationship between a parent and a child. ***Jones v. Garrett***, 92 S.W.3d 835, 839-840 (Tenn. 2000).

B.

The trial court terminated Putative Father's rights upon finding that he "has not provided any support for [the Child] since she came into DCS custody. " In this regard, Section 36-1-113(g)(9)(A)(*ii*) provides that termination can be based upon a finding that a "person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101." Putative Father asserts that during the first years of the Child's life, he provided for the Child "financially and emotionally." He submits that his failure to support the Child since then cannot be deemed willful since he was incarcerated much of the time.

The proof shows that Putative Father was living with Mother and the Child until he went to jail on July 1, 2009. The Child entered DCS custody on September 28, 2009, a fact of which Putative Father was admittedly aware. Putative Father was released in January 2010 and remained free for nearly six months before returning to jail. At no time since DCS took custody, including the months after his incarceration, did Putative Father provide any support for the Child. The proof does not preponderate against the trial court's finding that Putative Father failed to provide reasonable and consistent child support. To the contrary, Putative Father's own testimony strongly suggests that he conscientiously chose not to provide support in any measure, not because he was unable, but because he was denied visitation. On cross-examination, Putative Father testified:

-7-

[DCS counsel]: During the time that you were out of jail did you make any attempts to provide anything . . . for [the Child] with respect to child support or anything else?

[Putative Father]: I talked to Ms. Carrier and asked her for, I told her I would pay child support if I have to.

[DCS counsel]: But you never made any attempts to do that on your own?

[Putative Father]: Well, no, when I'm sitting there told, telling me that I have no rights to my child, I mean, I can't see my daughter or nothing like that, how am I[] going to pay support if they're telling me I can't even see her? I can't have nothing to do with her. Nothing. That she ain't even mine. Other than that, I mean, I'm not a deadbeat father. I, I want to take care of my kids. I supported [the Child] for five years of her seven years of her life. . . ."

C.

The trial court also terminated Putative Father's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii). That section provides, in relevant part, for termination when "[t]he person has failed to seek reasonable visitation with the child. . . ." In particular, the trial court, by clear and convincing evidence, found as follows:

[Putative Father] . . . has failed to attempt to seek reasonable visitation, and had failed to visit with the [C]hild since he was notified the [C]hild was in the custody of DCS. The proof showed that [Putative Father] was notified this [C]hild was in DCS custody and knew of his possible paternity of the [C]hild since her birth. During the five . . . or six . . . months when [Putative Father] was not incarcerated he took only minimal steps to attempt to visit the [C]hild consisting of several telephone calls.

The proof shows that Putative Father first inquired about visiting the Child after his release in early 2010. During the time he was not in jail, he admittedly was advised that in order to gain visitation rights, he needed to establish his paternity and the process was

-8-

explained to him "several times." At that time, he indicated to the case manager that he would pursue DNA testing on his own, but his anticipated tax refund apparently did not materialize to the extent expected and he essentially dropped the matter. The evidence does not preponderate against the trial court's termination of Putative Father's rights based on his failure to seek visitation with the Child.

D.

The trial court terminated Putative Father's rights based on his failure to establish his paternity in accordance with Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi). That section provides for termination when "[t]he person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3); . . . ." As to this ground, the trial court found that

> [Putative Father] knew at the birth of the [C]hild that she could potentially be his child. [Putative Father] has failed to file a petition for paternity with this Court, and has not notified DCS of his filing for paternity in any other Court.

The court concluded that Putative Father's rights should therefore be terminated "by reason of his failure to file a petition to establish paternity of the [C]hild within thirty (30) days after notification of alleged paternity."

At trial, Putative Father admitted that, while he and Mother were living together, Mother immediately notified him upon learning that she was pregnant. Putative Father took no action at that time to establish his paternity despite believing and holding himself out to be the Child's father. His testimony suggested he never felt the need to do so because he initially lived with the Child and was apparently treated as her father in his dealings with the state of Virginia. The proof further shows, however, that Putative Father failed to take action, other than a few phone calls to DCS – mainly involving obtaining a DNA test – to prove his paternity even after he knew that failing to do so meant that he would not be permitted to see the Child, much less be able to gain custody. After he returned to jail and the petition was pending, Putative Father's options may have been limited, yet he failed to exercise any of his available options, *i.e.*, by filing a petition to have his paternity adjudicated in court or executing a sworn, voluntary acknowledgment of paternity. Had Putative Father followed either course of action before the termination proceeding was initiated, he would have been deemed the Child's legal father. He also could have registered with the Putative Father Registry. He did not. In short, the evidence certainly does not

-9-

preponderate against the trial court's finding that Putative Father's rights should be terminated based on his failure to establish paternity of the Child.

In summary, the record before us contains clear and convincing evidence to support each of the cited grounds in support of the trial court's termination order. Simply stated, after the Child came into the custody of DCS, Putative Father did not support the Child and did not visit the Child. Furthermore, at no time did he establish his paternity of the Child. The trial court did not err in terminating Putative Father's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(*ii*), (*iii*), and (*vi*).

V.

Although not framed as a separate issue, Putative Father asserts in the argument section[4] of his brief that the trial court erred in its conclusion that termination of his rights is in the best interest of the Child. As we noted earlier, the termination of a parent's rights involves a two-step process. Parental rights may be terminated only if grounds for termination are proven *and* if termination is in the best interest of the child. ***In re F.R.R., III***, 193 S.W.3d at 530. (Emphasis added). Having concluded that grounds for termination were sufficiently proven in the present case, we next consider the trial court's best-interest analysis. Our review is guided by the non-exclusive list of factors set forth in Tenn. Code Ann. § 36-1-113(i).[5]

---

[4]*All* issues should be stated in the "Issues Presented for Review" section of the brief. *See* Tenn. R. App. P. 27(a)(4). Despite this deficiency in Putative Father's brief, we elect to address the issue of the Child's best interest. *See* Tenn. R. and P. 2.

[5]The statutory factors are as follows:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(continued...)

In the present case, the trial court cited several factors in support of its ruling. In particular, the court found that Putative Father had failed (1) to make a lasting adjustment of his circumstances, conduct, and conditions so as to make it safe for the Child to "go home," (that is, reside with him); (2) to establish visitation with the Child since she was removed to DCS custody; (3) to maintain a meaningful bond with the Child; and (4) to make any child support payments since the Child entered DCS custody. *See* Tenn. Code Ann. § 36-1-113(i)(2),(3), (4), and (9).

At the time of trial, Putative Father had just been released from prison after spending well over a year there, at least his second term of incarceration during the Child's young life. Putative Father always believed that he was the Child's biological father, but had never filed a petition to establish his paternity. Between his stints in state custody, Putative Father did little more than call the DCS case manager a few times to inquire about obtaining a DNA test, despite knowing that establishing paternity would have enabled him to at least gain visitation. In our view, Putative Father's testimony that he had "tried every way in the world to try to get paternity done so [he] could see [the Child]" rings hollow. Similarly, Putative Father was aware that the Child had been taken into DCS custody, but never provided her any support. In the several months he worked before returning to prison, Putative Father helped to support his mother, but provided not a cent for the Child. Putative Father offered

[5](...continued)

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

:

no viable reason for his failures in these areas, essentially testifying only that he was waiting for the case manager to assist him in getting a DNA test.

Putative Father last saw the Child on July 1, 2009, when she was almost five. A few months later, DCS took custody of her, and, some twenty-five months after that, there had been no further contact, no support, and certainly no evidence of any meaningful relationship between Putative Father and the Child. In the years since she joined her foster family, the Child remained closely bonded with her half-siblings, and became "inseparable" from her half-sister. The children lived together in a safe, comfortable foster home with opportunities for each of them to enjoy sports and other activities and to travel. The Child was receiving therapy for her behavioral issues and progressing under an individualized education plan at school.

Based on the foregoing, the evidence preponderates overwhelmingly in support of the trial court's best-interest determination. The trial court did not err in concluding that it was in the Child's best interest to terminate Putative Father's rights.

## VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Jason C. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE